COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Kelsey and Beales
Argued at Richmond, Virginia


DONALD B. FARMER, S/K/A
  DON B. FARMER
                                                        OPINION BY
v.       Record No. 0191-12-2                  JUDGE ROBERT J. HUMPHREYS
                                                        JANUARY 29, 2013
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Margaret P. Spencer, Judge[1]

Patrick R. Hanes (Devika E. Davis; Williams Mullen; Devika E.
Davis, P.C., on briefs), for appellant.

Katherine Quinlan Adelfio, Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.


Donald B. Farmer ("Farmer") appeals his convictions in the Circuit Court of the City of

Richmond ("trial court") for the 1987 murder of Eathel Fraenzel ("the grandmother"), rape of

P.F., and statutory burglary and robbery of P.F. or the grandmother or both.  Lorenzo Williams

("Williams") was convicted of these crimes in 1988, but his accomplice remained at large until

Farmer was identified through DNA evidence in 2010.  Farmer argues on appeal that Williams

having already been convicted, the Due Process Clause of the Fourteenth Amendment to the

Constitution of the United States prohibits the Commonwealth from prosecuting Farmer under

inconsistent theories regarding the identity of P.F.'s rapist and that the evidence was insufficient

to sustain Farmer's convictions as a matter of law.

For the following reasons, we affirm the judgment of the trial court.

---

[1] Judge Spencer presided over the trial of this case and entered the final sentencing order;
however, Judge Richard D. Taylor heard the pre-trial motions, including Farmer's motion to
quash the indictments.

I.  BACKGROUND

On appeal, we "'consider the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth, the prevailing party at trial.'" Crawford v. Commonwealth, 281 Va. 84, 97, 704 S.E.2d 107, 115 (2011) (quoting Bass v. Commonwealth, 259 Va. 470, 475, 525 S.E.2d 921, 924 (2000)).

A.  The Investigation and Trial

On October 4, 1987, eighteen-year-old P.F. lived with her grandmother in a second floor apartment on Hull Street.  That evening P.F. was on the phone with her friend Wayne Toman ("Toman") and the grandmother was watching heavy metal videos when P.F. heard a knock at the front door.  She put the phone down but did not hang up.  She opened the door to find a man whom she did not recognize.  He said "this is a stickup."  P.F. and the grandmother tried to push the door shut, but then another man appeared and the two men pushed the door open.  P.F. ran in the other room, grabbed the phone, and told Toman to call the police. [2]  One of the men jerked the phone out of P.F.'s hand.  The men demanded money.  The grandmother told them there was no money, but P.F. said she would tell them where the money was if they would just leave.  P.F. gave them six dollars.

The men started beating the grandmother.  When P.F. stepped forward to protect the grandmother, one man grabbed her around her neck from behind and the other man kicked her in the stomach.  The man who grabbed P.F. dragged her backwards down the hallway into the grandmother's room where no lights were on and it was dark[3]; he put her on the bed.  He told her to do exactly what she was told to do or she was going to die.  P.F. was terrified.  The man told

_____

[2] Toman left his house to get help for P.F.  His mother, Ora Mae Toman, picked up the phone and heard a male voice say, "Where is the money, bitch."  She heard a small little voice reply, "I don't have any."  Then she heard a smashing sound.

[3] The only light on in the apartment was in P.F.'s room.

her to get her pants off, so she did. Then the man got on top of P.F. and rubbed his penis all over her and inserted his penis in her vagina. P.F. testified that her "mind was in a rat race," and "I was trying to figure a way to get out of there, trying to get them out of there. I knew my grandmother needed help. And I knew that if something didn't happen, then we would both be dead." She and the rapist ended up on the floor. P.F. then reached for the grandmother's wallet and gave it to him. After knocking the grandmother out with a vase, the other man came into the bedroom and told P.F. that she "was going to suck his penis and [she] had better do it right or he was going to kill [her]." That man stuck his penis in her mouth while the man who raped her held her from behind.

Finally, P.F. heard Toman "hollering and banging" at the back door and police radios outside. The man who held P.F. during the sodomy disappeared, and she remained in the dark room with the man who stuck his penis in her mouth.[4] This man told her not to say a word or he was going to kill her. After a few minutes P.F. said she would try to help the man escape; she just wanted to get him out of the apartment. They passed the grandmother lying in the hallway in blood as he followed her to the front door. P.F. then opened the door and shoved him out of it. She ran through the apartment and out the back door, grabbed onto Toman, and told the police to go around front because one of the intruders was there. An officer detained Williams at the scene and recalled that his tennis shoes had a large amount of blood on them. P.F. saw Williams a little while later in the front of the building in the parking lot, but she did not see the other perpetrator who disappeared.

---

[4] P.F.'s testimony at Williams' trial was that Williams raped her, then tied something around her face and hands, the other man came into the grandmother's bedroom and made her suck his penis while Williams held her, and the man who stuck his penis in her mouth disappeared when there was banging on the door.

P.F. was transported to the Medical College of Virginia where a physician completed a rape kit that included obtaining combed pubic hair and vaginal swabs from P.F. The grandmother died in the hospital two days after the attack from blunt force trauma to the head. She had also suffered trauma to the chest, abdomen, and arms.

At Farmer's trial, P.F. testified that at the time of the rape she was in an exclusive dating relationship that lasted four and a half years. She also testified that she did not know Farmer, did not remember his face, and never had consensual sex with him. During the initial investigation in 1987, detectives presented P.F. with a photo array of six men including Farmer, but P.F. never identified Farmer as the one who raped her or had any role in the assault at her home. P.F. also told investigators in 1987 that she had never seen Farmer or Williams before in her life. The court admitted the transcript of Williams' 1988 trial into evidence, where P.F. identified Williams as the man who raped her. The Commonwealth also stipulated to P.F.'s former identification of Williams as the one who raped her.

P.F.'s 1987 interview statements to police were also entered into evidence at trial. During the interviews P.F. referred to the two perpetrators as "the one with the brown jacket on" and "the one with the red jacket on." She said the one in the brown jacket beat up the grandmother, sodomized her, and disappeared, and the one in the red jacket was the one who knocked on the door and raped her. Williams was wearing the red jacket. P.F. told investigators that both men were black and about the same size and weight. Williams was convicted and sentenced to life plus eighty-three years for these crimes.

### B. DNA Evidence, Farmer's Confession, and the Motion to Quash the Indictments

In 2005, as Governor Warner was leaving office, he directed the Commonwealth's Department of Forensic Science to conduct DNA tests on all old cases that contained original biological evidence. This review led to DNA testing of P.F.'s rape kit from 1987. The

Department of Forensic Science sent the biological evidence from this case to Melissa Murphy of BODE Technology in 2008. She performed analysis, developed various DNA profiles, and generated a report summarizing the results. Her report to the Department of Forensic Science resulted in a certificate of analysis from the Department of Forensic Science dated February 25, 2010 that read, "The DNA profile developed from the sperm fraction of the vaginal/cervical swabs [of P.F.] was searched against the Virginia DNA Data Bank and found to be consistent with [Farmer]."

On January 25, 2011, Detectives Simmons and Foster interviewed Farmer. Farmer initially stated that he never had a white girlfriend and was not involved in the 1987 incident. Then the detectives confronted Farmer with the DNA analysis. Farmer first responded by stating that he did not remember back then and that it has been a long time, but he never raped a white woman. After remaining silent for a short time, Farmer said that he and P.F. were dating and they had sex that night while the grandmother was there and that he had been to the apartment three or four times before. Later in the interview Farmer said "Yeah it was all a mistake."

> I was there . . . and um well with the girl I knew her, you know what I'm saying, but way things happened Renzo wanted to rob, go up there and rob somebody . . . you know, so I was the – you know so it's like he said he pushed me up in the house . . . then the girl you know she was crying and everything so only thing I did, you know, was was [sic] ah take her in the back and Renzo in there beating up on the woman, you know, and that's way it happened. He was all coked up.

Farmer added, "And I raped her." He said he did not touch the grandmother. When asked what he saw, Farmer replied, "Renzo, he just start fighting on the lady. . . . He just beat her up, you know, then I went took took [sic] the ah granddaughter in the back room on the side room." He said he didn't "know bout no money." The detectives took a buccal swab of the inside of Farmer's mouth for further DNA analysis.

Another certificate of analysis dated March 23, 2011, revealed that Farmer could not be eliminated as a contributor to the DNA found in P.F.'s vaginal swabs, thigh/vulva swabs, and underpants and that Lorenzo Williams and P.F.'s boyfriend at the time were eliminated as contributors to the foreign DNA found in all three areas.

Farmer argued in a pre-trial motion that because the Commonwealth prosecuted Williams as a principal in the first degree to the rape in 1988, they could not proceed with the prosecution of Farmer as the principal in the first degree of the rape in 2011. Farmer contended that these two theories of the case could not co-exist and the indictments should be quashed. The trial court denied Farmer's motion to quash the indictments.

At the conclusion of the evidence, the trial court instructed the jury on principal in the first degree, principal in the second degree, and concert of action. The jury convicted Farmer on all four counts as charged, and the court sentenced him to 125 years incarceration as recommended by the jury.

## II.  ANALYSIS

"Constitutional arguments present questions of law that this Court reviews *de novo*." D.L.G. v. Commonwealth, 60 Va. App. 77, 81, 724 S.E.2d 208, 210 (2012). However, when we consider "the sufficiency of the evidence on appeal, we must review the trial court's factfinding 'with the highest degree of appellate deference.'" Ervin v. Commonwealth, 57 Va. App. 495, 502, 704 S.E.2d 135, 138 (2011) (quoting Noakes v. Commonwealth, 54 Va. App. 577, 586, 681 S.E.2d 48, 52 (2009) (*en banc*)).

A.  Due Process

Farmer argues that the trial court "erred in denying [his] motion to quash the indictment

because the Due Process Clause prohibits the Commonwealth from presenting mutually

inconsistent theories against different defendants."[5]

In support of his assignment of error, Farmer cited a portion of the following excerpt

from United States v. Higgs, 353 F.3d 281 (4th Cir. 2003):

> In some situations, the Due Process Clause prohibits the
> government from presenting mutually inconsistent theories of the
> same case against different defendants.  For example, due process
> may be violated if "an inconsistency . . . exists at the *core* of the
> prosecutor's case against the defendants for the same crime," see
> Smith v. Groose, 205 F.3d 1045, 1052 (8th Cir. 2000) (finding due
> process violation where prosecution obtained two convictions for
> the same murder based on conflicting statements from the same
> cooperating codefendant) (emphasis added), or where the evidence
> used at the two trials is "factually inconsistent and irreconcilable,"
> [United States v.] Paul, 217 F.3d [989,] 998 [(8th Cir. 2000)]
> (holding that [the] government's argument that both defendants
> were the triggerman and killed the victim was not inconsistent). . . .
>
> No such inconsistency exists in this case.

Id. at 326.  However, the Fourth Circuit Court of Appeals noted in a later opinion that this

language from Higgs is only dictum and not binding precedent.  DeCastro v. Branker, 642 F.3d

442, 458 (4th Cir. 2011).  The DeCastro court also noted that prior to Bradshaw v. Stumpf, 545

U.S. 175 (2005), "the Supreme Court had not suggested that inconsistent prosecutorial theories

could constitute a due process violation.  [Bradshaw, 545 U.S.] at 190 (Thomas, J., concurring)

---

[5] This is an issue of first impression in the Commonwealth.  The Supreme Court of Virginia declined to address a similar legal argument in Muhammad v. Commonwealth, 269 Va. 451, 489, 619 S.E.2d 16, 37 (2005), where Muhammad argued that the Commonwealth violated principles of due process "'by simultaneously taking materially inconsistent positions in the Muhammad case, where it claimed Muhammad directed and controlled Malvo, and in the Malvo case where it claimed that Malvo was a free agent.'"  "We need not address the legal arguments advanced by Muhammad because we hold that the theories of prosecution by the two independent prosecutors were not inconsistent."  Id. at 489, 619 S.E.2d at 37-38.

('This Court has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories.')." DeCastro, 642 F.3d at 457-58.

In Bradshaw, Stumpf pled guilty to aggravated murder and the State argued before the sentencing panel that Stumpf was the principal offender in the murder. The panel specifically found that Stumpf was the principal offender in the aggravated murder and sentenced him to death. Bradshaw, 545 U.S. at 180. When Stumpf's accomplice, Wesley, was brought to trial, the prosecutor had new evidence: Wesley's cellmate testified that Wesley admitted to firing the shots in the murder. The prosecutor argued that Wesley was the principal offender and that he therefore deserved the death penalty. Id. The Supreme Court held that the Court of Appeals for the Sixth Circuit erred in holding that the "prosecutorial inconsistencies between the Stumpf and Wesley cases required voiding Stumpf's guilty plea." Id. at 186-87. Because Ohio law "considers aiders and abettors equally in violation of the aggravated murder statute, so long as the aiding and abetting is done with the specific intent to cause death," id. at 184, the "precise identity of the triggerman was immaterial to Stumpf's conviction for aggravated murder," id. at 187. However, the Supreme Court indicated that the prosecutor's use of inconsistent and irreconcilable theories may have prejudiced the petitioner's sentence and remanded for proceedings consistent with the opinion. Id. at 187-88.

In Smith v. Groose, 205 F.3d 1045, 1047 (8th Cir. 2000), the Eighth Circuit held that the "State's use of inconsistent prosecutorial theories violated Smith's due process rights in a way that rendered his convictions fundamentally unfair." Within a week of the murders, a witness gave police two different statements regarding the murder of the victims. In one account, the witness said that when he, Smith, and other cohorts arrived at the victims' home hoping to burglarize it, the victims were already dead. The prosecutor relied on this account in prosecuting Cunningham who was burglarizing the victims' home when Smith and his companions arrived.

Cunningham was convicted of first-degree murder. In a statement made by the same witness two days after the first statement, the witness said that he saw one of Smith's companions stabbing one of the victims, who was not already dead. This statement was introduced in Smith's trial, and he was convicted of two counts of felony murder. Smith and Cunningham were not part of the same criminal enterprise. Id. at 1047-48. The court concluded, "We do not hold that prosecutors must present precisely the same evidence and theories in trials for different defendants. Rather, we hold only that the use of inherently factually contradictory theories violates the principles of due process." Id. at 1052.

Smith is not binding precedent on this Court and in any event is distinguishable from the present case. In Smith the prosecution relied on factually irreconcilable statements of the same witness to convict two unassociated criminals of murdering the same victims. In the present case, new evidence led to Farmer's prosecution and the new evidence was not the irreconcilable statements of a witness, but newly discovered DNA evidence and Farmer's confession to the rape. Notably, P.F., who identified Williams as the man who raped her in the 1988 trial, testified that she did not recognize Farmer at the 2011 trial.

Farmer also cites Thompson v. Calderon, 120 F.3d 1045 (9th Cir. 1997), in support of his case. The Ninth Circuit stated that "it is well established that *when no new significant evidence comes to light* a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime." Id. at 1058 (emphasis added). The court later characterized its holding in Thompson as based on the fact that the prosecutor manipulated evidence and witnesses and charged different defendants "in separate trials with the same murder that had been committed by *an individual*." Nguyen v. Lindsey, 232 F.3d 1236, 1240 (9th Cir. 2000) (emphasis added) (citing Thompson, 120 F.3d at 1054-57). The

prosecutor's actions in Thompson amounted to misconduct. Id. Farmer does not allege prosecutorial misconduct in the present case nor is there evidence of any in this record.

The present case is factually more similar to Nguyen, where the Ninth Circuit noted that "trial preparation is not a static process. As a case evolves, new witnesses come forward; others become unavailable. As new evidence is uncovered, other evidence loses its significance." Id. Prosecutors charged Nguyen and Phung, members of rival gangs, with the murder of an innocent bystander. They were tried separately. At Phung's trial the prosecutor argued that Phung had fired the first shot. This argument was based on the evidence adduced at trial, including a stipulation to the fact by Phung's counsel. At Nguyen's trial, the prosecutor introduced into evidence Nguyen's own statement to the police in which he said that a member of his gang in the car he was driving fired the first shot. Nguyen was convicted of first-degree murder, and filed a state habeas petition arguing "that the prosecutor's use of the inconsistent evidence of which gang fired the first shot violated his due process rights." Id. at 1238. The court noted that there was "no allegation of falsified evidence, prosecutorial bad faith, or even that Nguyen was surprised by the nature of the evidence introduced against him." Id. "[U]nder California law, those who take part in gang warfare are equally responsible for the death of an innocent bystander. This was [the prosecutor's] underlying theory at both trials." Id. at 1240-41. The court held that the prosecutor did not violate Nguyen's right to due process of law. Id. at 1241.

Farmer has not alleged, much less demonstrated, prosecutorial misconduct or bad faith. He does not argue that the prosecution falsified or manipulated evidence. The Commonwealth willingly conceded before the jury that P.F. previously identified Williams as her rapist in 1988, and P.F. did not identify Farmer as her assailant when she testified at the 2011 trial. Instead, in prosecuting Farmer, the Commonwealth relied on the newly discovered DNA evidence and Farmer's confession to the rape after he was confronted with the DNA evidence. The

- 10 -

Commonwealth argued that there was a "very real and reasonable probability that the victim of a two-perpetrator rape, robbery, murder, home invasion was mistaken[] [about] the identity of one of the perpetrators when he raped her in a dark house."

Further, in Virginia, principals in the second degree "may be indicted, tried, convicted, and punished as principals in the first degree." Sutton v. Commonwealth, 228 Va. 654, 665, 324 S.E.2d 665, 671 (1985) (citing Code § 18.2-18). It is well established in felony cases:

> A principal in the first degree is the actual perpetrator of the crime. A principal in the second degree, or an aider and abettor as he is sometimes termed, is one who is present, actually or constructively, assisting the perpetrator in the commission of the crime. In order to make a person a principal in the second degree actual participation in the commission of the crime is not necessary. The test is whether or not he was encouraging, in citing [sic], or in some manner offering aid in the commission of the crime. If he was present lending countenance, or otherwise aiding while another did the act, he is an aider and abettor or principal in the second degree.

Muhammad v. Commonwealth, 269 Va. 451, 482, 619 S.E.2d 16, 33 (2005).

In Washington v. Commonwealth, 216 Va. 185, 191, 217 S.E.2d 815, 822 (1975), where the record was unclear as to which of two inmates fired the shots that killed an officer, the Supreme Court of Virginia stated that the "Commonwealth did not have to establish which of the two inmates fired the fatal shots." "Washington and Jefferson were equally responsible for the consequences of the acts of the other." Id. The jury was properly instructed that Washington could be found guilty "either as a principal in the first degree or a principal in the second degree, if the jury found that [the officer's death] resulted from a concert of action or a joint venture engaged in by the two inmates." Id. at 191, 217 S.E.2d at 821.

Under Virginia law, both Farmer and Williams were equally guilty for the crimes against P.F. and her grandmother. The trial court properly instructed the jury on principal in the first degree, principal in the second degree, and concert of action. Again, Farmer did not allege any

- 11 -

misconduct or bad faith on the part of the prosecutor in introducing new evidence at Farmer's trial that was not available at Williams' trial. "It is well-established that the use of inconsistent theories in the separate trials of co-defendants is *not* a violation of the due-process clause." Pondexter v. Quarterman, 537 F.3d 511, 527 (5th Cir. 2008) (emphasis in original). Thus, we decline to apply the overly broad holding of the Eighth Circuit in Smith, and hold that in the absence of prosecutorial misconduct or bad faith, there is no due process basis for reversing Farmer's convictions simply because the prosecution proceeded under inconsistent theories of the identity of the principal in the first degree in the trials of Farmer and Williams regarding the rape of P.F.

### B. Sufficiency of the Evidence

Farmer also contends that "[t]he evidence was insufficient as a matter of law to support [his] convictions."

When the sufficiency of the evidence is challenged on appeal, this Court must "'examine the evidence that supports the conviction and allow the conviction to stand unless it is plainly wrong or without evidence to support it.'" Commonwealth v. McNeal, 282 Va. 16, 20, 710 S.E.2d 733, 735 (2011) (quoting Vincent v. Commonwealth, 276 Va. 648, 652, 668 S.E.2d 137, 139-40 (2008)). The Court should review the evidence in the light most favorable to the Commonwealth, as the prevailing party below, and determine whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Id. (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). "Furthermore, we 'accord the Commonwealth the benefit of all inferences fairly deducible from the evidence.'" Brooks v. Commonwealth, 282 Va. 90, 95, 712 S.E.2d 464, 466 (2011) (quoting Glenn v. Commonwealth, 275 Va. 123, 130, 654 S.E.2d 910, 923 (2008)).

The evidence in the record supports the conclusion that Farmer was Williams' accomplice on October 4, 1987, and committed the rape of P.F. P.F. testified that she never had consensual sex with Farmer, and she could not identify him as someone she knew. Although P.F. identified Williams as her rapist in 1988, Williams was eliminated as a contributor to the DNA found in the three different samples taken from P.F. after the rape, whereas Farmer's DNA matched the DNA profiles developed from those three samples. Further, after changing his story several times over a two-hour interview, Farmer confessed to sexually assaulting P.F. With Farmer's confession, only slight corroboration of the confession is required to establish that Farmer perpetrated the crime beyond a reasonable doubt. Jackson v. Commonwealth, 255 Va. 625, 646, 499 S.E.2d 538, 551 (1998). That slight corroboration is easily supplied by the DNA evidence. The jury could reasonably infer from the evidence that P.F. was honestly mistaken as to the identity of her rapist when the assault occurred at night in a dark apartment and the assailants were similar in appearance and that notwithstanding her misidentification, the DNA results and his confession prove that Farmer was the rapist and was present and participated in the murder, burglary, and robbery.

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.