COURT OF APPEALS OF VIRGINIA

Present:    Chief Judge Decker, Judge O'Brien and Senior Judge Haley
Argued by teleconference

RAIQUAN MALIQUE SIMS

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0807-21-2                      JUDGE JAMES W. HALEY, JR.
                                                    OCTOBER 4, 2022
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
W. Reilly Marchant, Judge

Daniel W. Hall for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General; David M. Uberman, Assistant Attorney
General, on brief), for appellee.


Raiquan Malique Sims challenges the sufficiency of the evidence supporting his

conviction for first-degree murder, in violation of Code § 18.2-32.[1]  Concluding that sufficient

evidence supports Sims's conviction, we affirm.

BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, the prevailing party [below]." *Poole v. Commonwealth*,

73 Va. App. 357, 360 (2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)).  This

standard requires us to "discard the evidence of the accused in conflict with that of the

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Although Sims's listed assignments of error challenge his conviction for use of a
firearm in the commission of a felony, in violation of Code § 18.2-53.1, his opening brief makes
no argument concerning that conviction.  Failure to include argument as to an assignment of
error waives appellate review of that issue.  Rule 5A:20(e).

Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn [from that evidence]." *Bagley v. Commonwealth*, 73 Va. App. 1, 26 (2021) (alteration in original) (quoting *Cooper v. Commonwealth*, 54 Va. App. 558, 562 (2009)).

Around 1:45 a.m. on April 23, 2020, Richmond Police Officer Stephen Pishock responded to a dispatch about a shooting and discovered Keontae Fox lying unconscious in the street near the intersection of 21st Street and R Street. When Pishock approached, he saw that Fox had a gunshot wound to the upper chest. Pishock found a bullet underneath Fox's body, later identified as 9mm. Pishock acknowledged that police had not blocked off the street until two or three minutes after he arrived.

Randall Thomas lived near the location where Pishock found Fox's body. Thomas testified that, after hearing what sounded like gunshots, he checked his security camera footage, on which he "heard a group of gunfire, a pause, and then more gunfire." The Commonwealth played that footage at trial.

Around 1:45 a.m. that morning, Richmond Police Officers Dylan Coleman, Edward Curran, Charles Arendall, Jr., and Justin Waitt were sitting in their patrol cars in a school parking lot several blocks from where Pishock found Fox when they heard what sounded like gunshots or fireworks. The officers drove in the direction of the sound to investigate and observed a white Hyundai pull out of an alleyway with its lights off. Coleman and Curran stopped the car, which had four young males inside, including Sims, who was sitting in the backseat behind the driver. Coleman testified that the driver "appeared scared, terrified. He was very sweaty, had a lot of sweat dripping down his face." Coleman described Sims, by contrast, as "very respectful and cooperative."

The officers removed the four men from the car and detained them while the officers searched the car. Coleman found a 9mm firearm in the back pocket on the passenger's side that was hot to the touch and had two rounds jammed inside the barrel in the magazine. Arendall and Curran found another 9mm firearm under the driver's seat whose slide was locked to the rear and whose barrel was hot to the touch.

Richmond Police Detective Michael Gouldman interviewed the car's occupants at the scene, including Sims. Sims denied knowing anything about the shooting and claimed that he had not heard any gunshots. He also denied handling any of the firearms and claimed not to know that they were in the car. Gouldman took a buccal swab from Sims.

Richmond Police Detective John Graham investigated the crime scene. He discovered twelve 9mm cartridge cases on the sidewalk on 21st Street south of R Street, one 9mm cartridge case in a nearby alleyway, and four .40 caliber cartridge cases in the street near the sidewalk where he found the 9mm cases. He also recovered, as relevant here, the 9mm bullet that was under Fox's body and a .40 caliber bullet jacket near the curb several feet west of where Fox's body had been located. After police impounded the Hyundai and obtained a search warrant, Graham located a .40 caliber Glock with an extended magazine hidden behind the paneling on the back of the driver's seat, in front of where Sims had been sitting. Graham swabbed the Glock for DNA.

Assistant Chief Medical Examiner Crystal Van Dusen performed an autopsy on Fox and determined that Fox died from "multiple gunshot wounds." Specifically, she identified six gunshot wounds, that: (1) entered and exited Fox's right arm before reentering his right underarm and exiting his shoulder, (2) entered Fox's right chest and exited his left upper back, (3) entered Fox's right thigh and did not exit, (4) entered Fox's right back and did not exit, (5) grazed Fox's right hand, and (6) grazed Fox's left hand. All gunshots entered right to left.

She recovered a 9mm bullet fragment from Fox's back associated with the fourth gunshot wound. Van Dusen opined that the second wound would have been the most fatal but that each wound was potentially fatal.

Forensic Firearms Examiner James Bullock examined the thirteen 9mm cartridge cases recovered by Graham, the 9mm bullets recovered by Graham and Van Dusen, the four .40 caliber cartridge cases recovered by Graham, and the .40 caliber bullet jacket recovered by Graham. Bullock opined that the 9mm cartridge cases and bullets were fired by at least three different firearms: eight of the cartridge cases and the bullet fragment Van Dusen recovered came from the 9mm firearm found under the driver's seat, three of the cartridge cases came from the 9mm firearm found in the back pocket on the passenger side, and two of the cartridge cases and the bullet discovered with Fox's body came from unidentified firearm(s). Most importantly for this appeal, Bullock testified that all four .40 caliber cartridge cases and the .40 caliber bullet jacket were fired by the .40 caliber Glock found stuffed inside the back of the driver's seat.

Forensic Scientist Kristin Van Itallie tested Sims's buccal swab and the DNA swab Graham took from the .40 caliber firearm. She opined that Sims could not be eliminated as a major contributor of DNA found on the firearm and that the chances of a randomly selected person matching that DNA profile would be greater than one in 7.2 billion.

Gouldman interviewed Sims again on May 20, 2020. After waiving his *Miranda*[2] rights, Sims denied knowing about the shooting or the firearms in the car and indicated that his life could be in danger if he gave Gouldman any more information. Gouldman testified that Sims "continued to deny for quite a while" but, after Gouldman falsely indicated that the other suspects had talked to the police about the incident, Sims told Gouldman that the four men "had all gotten out of the car. Shots were fired. They all ran back to the car." Sims told Gouldman

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

that he got into the car first and that the others fired some more shots after Sims got into the car. Sims admitted that everyone in the car was armed with a firearm and that "[e]verybody in the car was shooting." Sims told Gouldman that his gun was under his seat and that he did not know the caliber but knew that it was black and had an extended magazine. He denied knowing how many shots he fired and claimed that "he was along for the ride and didn't know whose idea it was." As to why they shot Fox, Sims said merely "that they had noticed him out walking."

Sims moved to strike the evidence, which the trial court denied. After Sims renewed his motion to strike and made a closing argument, the trial court opined that the evidence was sufficient to find Sims guilty of first-degree murder on any one of three grounds: (1) Sims shot Fox; (2) Sims and the other shooters acted under concert of action; and (3) Sims acted as a principal in the second degree. The trial court therefore found Sims guilty of first-degree murder and use of a firearm in the commission of a felony and sentenced him to forty-three years' imprisonment with thirteen years suspended. This appeal followed.

## ANALYSIS

Sims challenges the sufficiency of the evidence on two grounds.[3] First, he argues that the Commonwealth failed to prove that he acted with the premeditation required to sustain a first-degree murder conviction. Second, he argues that he was guilty, at most, of attempted murder because the Commonwealth failed to prove that one of his bullets killed Fox. We address Sims's second argument first.

"On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v.*

---

[3] Although Sims's opening brief lists four assignments of error, the argument section is separated into only I.(A) and I.(B).

- 5 -

*Commonwealth*, 296 Va. 450, 460 (2018)). "The question on appeal, is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

Murder, whether first degree or second degree, "is a homicide committed with malice, either express or implied." *Tizon v. Commonwealth*, 60 Va. App. 1, 11 (2012) (quoting *Pugh v. Commonwealth*, 223 Va. 663, 667 (1982)). The trial court opined that the evidence was sufficient to find Sims guilty on any one of three grounds: (1) Sims killed Fox; (2) Sims acted in concert of action with the killer(s); or (3) Sims acted as a principal in the second degree. We agree with Sims that there was insufficient evidence to conclude that he directly killed Fox. There was no evidence that Sims fired, or even handled, any of the 9mm firearms. The bullet found underneath Fox's body and the bullet fragments Van Dusen recovered from Fox's back were both 9mm and therefore cannot be connected to Sims. The Commonwealth did not connect any of Fox's other wounds to a specific firearm or bullet caliber. Accordingly, there is no evidence that Sims fired any of the shots that killed Fox.

That does not mean that Sims cannot be found guilty of a completed murder. "[P]rincipals in the second degree 'may be indicted, tried, convicted, and punished as principals in the first degree.'" *Farmer v. Commonwealth*, 61 Va. App. 402, 414 (2013) (quoting *Sutton v. Commonwealth*, 228 Va. 654, 665 (1985)); *see also* Code § 18.2-18. "A principal in the second degree . . . is one who is present [and], actually or constructively, assist[s] the perpetrator in the

commission of the crime." *Muhammad v. Commonwealth*, 269 Va. 451, 482 (2005) (quoting *Jones v. Commonwealth*, 208 Va. 370, 372 (1967)).

A defendant is guilty as a principal in the second degree when he acts in concert of action with the perpetrator(s) of the offense. *Carter v. Commonwealth*, 232 Va. 122, 125 (1986). When a group acts in such a way that the resulting crime is "one of [the] incidental probable consequences" of such group action, "all who participate in any way in bringing about [that] crime[] are equally answerable and bound by the acts of every other person connected with the consummation of such resulting crime." *Winston v. Commonwealth*, 268 Va. 564, 602 (2004) (upholding concert of action jury instruction).

Read in the light most favorable to the Commonwealth, the evidence was sufficient to establish that Sims acted in concert with the other shooters and is guilty as a principal in the second degree. First, there is ample evidence connecting Sims to the .40 caliber firearm found inside the seat in front of where Sims was sitting. DNA consistent with Sims's DNA profile was found on the firearm and Sims admitted to Gouldman that he had a black gun with an extended magazine, matching the Glock's description. Second, there is ample evidence that Sims fired that gun multiple times in Fox's direction. Graham found four .40 caliber casings that Bullock determined were discharged by the Glock. Graham also found a bullet jacket tied to the Glock several feet from where Fox's body was found, indicating that Sims had fired toward Fox. Finally, there is ample evidence that Sims took these actions in concert with the other shooters. Sims admitted to Gouldman that "[e]verybody in the car was shooting." That admission is consistent with the crime scene evidence. The .40 caliber and 9mm cartridge cases that Graham recovered were grouped relatively close together, showing that the shooters were all shooting at Fox from the same direction, and Bullock connected most of those 9mm cartridge cases to firearms found in the car in which Sims was traveling. In short, the evidence established that

- 7 -

Sims and at least two others fired bullets at Fox at the same time from the same direction—causing Fox's death—and then drove away together in the same car. Because Fox's death was a "probable consequence" of such action, Sims is equally answerable for the crime as the other shooters. Accordingly, Sims's argument that he was guilty only of attempted murder fails.

Sims also argues that the Commonwealth failed to establish that he acted with premeditation. "To sustain the charge of first-degree murder, the Commonwealth had to show that Sims committed a 'willful, deliberate, and premeditated killing.'" *Castillo v. Commonwealth*, 70 Va. App. 394, 416 (2019) (quoting Code § 18.2-32). "Premeditated murder . . . contemplates: (1) a killing; (2) a reasoning process antecedent to the act of killing, resulting in the formation of a specific intent to kill; and (3) the performance of that act with malicious intent." *Fields v. Commonwealth*, 73 Va. App. 652, 674 (2021) (quoting *Rhodes v. Commonwealth*, 238 Va. 480, 486 (1989)). "Because 'premeditation and formation of an intent to kill seldom can be proved by direct evidence, a combination of circumstantial factors may be sufficient.'" *Id.* (quoting *Aldridge v. Commonwealth*, 44 Va. App. 618, 655 (2004) (alterations omitted)). "The intention to kill need not exist for any specified length of time prior to the actual killing." *Aldridge*, 44 Va. App. at 655 (internal citations and alterations omitted). Rather, "a design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill." *Id.* (internal citations and alterations omitted). "[E]vidence of a mortal wound inflicted by a deadly weapon with little or no provocation creates an inference from which the trier of fact may conclude that the killer acted with premeditation." *Morris v. Commonwealth*, 17 Va. App. 575, 578 (1994) (citing *Hodge v. Commonwealth*, 217 Va. 338, 343 (1976)).

Establishing that a defendant acted in concert of action with others establishes criminal liability upon a legal theory of transfer of intent. *See Riddick v. Commonwealth*, 226 Va. 244,

248 (1983) (holding that "[d]ue to the concert of action, defendant is deemed to have shared [the codefendant's] intent"). Accordingly, if any of the shooters had the specific intent to kill Fox, that intent is also imputed to Sims.

The evidence established that Sims and his accomplices fired the three recovered firearms at Fox at least fifteen times, hitting Fox six times. In the absence of provocation, this barrage is sufficient to create an inference that Sims acted with premeditation. *Cf. Goins v. Commonwealth*, 251 Va. 442, 467 (1996) (affirming first-degree murder convictions where the defendant killed family members with repeated gunshots).

Sims suggests that shots may have been "fired at the group [Sims] was with" and that the trial court erred by rejecting this assertedly reasonable hypothesis. "Merely because [a] defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded. What weight should be given evidence is a matter for the [factfinder] to decide." *Edwards v. Commonwealth*, 68 Va. App. 284, 301 (2017) (alteration in original) (quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004)).

A reasonable fact finder could reject Sims's contention. First, Sims points to Coleman's testimony that the driver appeared scared. At this stage, we grant all inferences in the Commonwealth's favor. One such inference is that the driver appeared scared because he was being confronted by multiple police officers shortly after helping commit a fatal shooting.

Second, Sims points to the 9mm cartridge cases that were unconnected to any recovered firearm. Again, granting all inferences in the Commonwealth's favor, those cases are more likely to have come from the fourth member of Sims's group. Sims told Gouldman that everyone in the car was armed with a firearm and "[e]verybody in the car was shooting." There were four people in the car, suggesting that the fourth member of the group was able to dispose

of his firearm before police located it. Moreover, the unmatched 9mm cases were found interspersed with the other 9mm cases, showing that the shooters were all standing near each other, a fact that is more suggestive of those shooters firing at a shared target than at each other. Even more probative, one of the unmatched 9mm bullets was found underneath Fox's body, showing that the fourth shooter was shooting at Fox rather than at Sims's group. Finally, when Gouldman asked Sims why they shot Fox, Sims answered only "that they had noticed him out walking."

Third, Sims points to his statement to Gouldman that he feared for his life. Gouldman testified that Sims told Gouldman that Sims's "life could potentially be in danger if he told [Gouldman] any more about what happened that night." That statement does not establish that Sims feared for his life that night but rather shows that Sims feared for his safety moving forward should he cooperate with the police.

Finally, Sims also argues that "his demeanor during his recorded interview conveyed remorse rather than cold hearted determination." Determinations based on a witness or defendant's demeanor are better suited to the fact finder than the appellate court. In any event, a defendant's expression of remorse nearly a month after the fact does not negate premeditation. In the more immediate aftermath of the shooting, Sims attempted to hide his firearm from the police and denied any knowledge or involvement. Furthermore, Gouldman testified that, during the recorded interview in which Sims allegedly conveyed remorse, Sims continued to deny his involvement.

Because there was no evidence of provocation, a reasonable fact finder could conclude that Sims acted with premeditation and the specific intent to kill when he fired a .40 caliber firearm at the victim at least four times alongside at least two other shooters, resulting in the victim's death.

## CONCLUSION

For the foregoing reasons, sufficient evidence supports Sims's first-degree murder conviction. Sims has waived appellate review of his use of a firearm conviction. We therefore affirm the trial court's judgment.

*Affirmed.*