COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, AtLee and Malveaux
Argued by videoconference


KEITH MONTRELL BAILEY

v.      Record No. 0785-23-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE MARY BENNETT MALVEAUX
JULY 16, 2024


FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
David E. Johnson, Judge

Gregory R. Sheldon (Bain-Sheldon, on brief), for appellant.

Justin B. Hill, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


A jury convicted Keith Montrell Bailey ("appellant") for robbery and use of a firearm in the

commission of a felony, both as a principal in the second degree, in violation of Code §§ 18.2-58

and -53.1, respectively, and conspiracy to commit robbery, in violation of Code §§ 18.2-22 and

18.2-58.[1] Appellant argues the evidence was insufficient to prove he acted as a principal in the

second degree. For the following reasons, we disagree and affirm the trial court.

## I. BACKGROUND

"When presented with a sufficiency challenge in criminal cases, we review the evidence in

the 'light most favorable' to the Commonwealth, the prevailing party in the trial court."

*Commonwealth v. Cady*, 300 Va. 325, 329 (2021) (quoting *Commonwealth v. Hudson*, 265 Va. 505,

514 (2003)). This standard "requires us to 'discard the evidence of the accused in conflict with that

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] The jury acquitted appellant of first-degree murder as a principal in the second degree.

of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Id.* (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

A. The Robbery and Shooting

Dwayne Swann, the victim, lived with his mother, sister, and uncle in Chesterfield County. Swann sold drugs out of their house. On the evening on February 14, 2019, appellant drove his girlfriend, Erica McNeil, to Swann's house so McNeil could complete a drug transaction she had arranged with Swann.

Chauncey Evans, Swann's uncle, testified that he and Swann were the only residents at home that night after about 10:00 p.m. While Evans was watching television in his room at the back of the house, he "heard some scrambling or whatnot." He first thought Swann might be watching a basketball game on the kitchen television, but then he heard someone say, "hey man," followed by a gunshot. Evans lifted up his bedroom window, which looked toward the back deck, and saw that a motion-activated light had come on. He jumped out of the window, walked to the stairs to the deck, and found Swann sitting motionless on the stairs. Swann had been shot once in the head. Evans immediately telephoned appellant's mother and then called 911. Telephone records entered into evidence at trial demonstrated that Evans called appellant's mother at 10:33 p.m. and 911 at 10:37 p.m.

Jewell Brown lived next door to the Swann residence. On February 14, Brown and her daughter, K.B.,[2] returned home at about 9:30 p.m. Later, from her bedroom, K.B. heard yelling outside followed closely by a gunshot. Brown also heard yelling that "sounded like [it was] in the yard next door." She turned off the light in her room so she could see out her window, and looked

---

[2] We use the juvenile daughter's initials, rather than her name, to protect her privacy.

outside to see a car "peeling off." The car, a sedan of a "light color," was "pulling [away] from . . . Swann's house and it did like a u-turn and zoomed the other way."

Police answering Evans's 911 call found Swann on the porch stairs with his pocket turned out and his cell phone missing. They declared Swann dead at 10:45 p.m. Swann's autopsy later attributed his death to a "penetrating gunshot wound to the head." Police found bloodstains just inside the front door of the home, as well as traces of blood in the living room and kitchen. A blood trail led from the kitchen to the back of the house, and there was blood on the back door leading to the deck where Swann was found. A television appeared to be missing from the kitchen, and an HDMI or television cord was on the front porch. Police also found that an armoire and dresser drawers in a second-floor bedroom had been opened, and on the second-floor landing they found an empty glass jar surrounded by change.

Unable to find Swann's cell phone at the crime scene, officers called it. An analysis of Swann's cell phone records determined that at 12:38 a.m. on February 15, his phone was using a cell tower that provided coverage to part of Wilkinson Road in Henrico County. Police arrived in that area at about 3:30 a.m. on February 15 and found Swann's phone in the woods. The phone was about 30 yards from the road and directly off the passenger's side of a "light color," "light blue" Lincoln Town Car parked on the shoulder. The Lincoln, which was registered to William Greene, was parked across the road from the Treehouse Apartments where Greene lived.

After they found Swann's cell phone, police surveilled the Lincoln for activity in or around it. At about 6:30 a.m. on February 15, police saw two men leave the Treehouse Apartments, walk to the Lincoln, get in the car, and drive away. Police later identified the driver as Greene.

B. Cell Phone Data Analysis

Police investigation of Swann's cell phone records showed that in the minutes before his death, Swann's phone received three calls from the phone of appellant's girlfriend, McNeil; these

were the last three calls received by Swann's phone prior to his death. Investigation of McNeil's cell phone records showed that her phone communicated with the phones of both Greene and Tramelle Jones throughout February 14, and again during the morning of February 15. Further analysis was conducted by F.B.I. Special Agent Jeremy D'Erricho, who testified as an expert in historical cell site and location data analysis. D'Erricho reviewed data from the phones of Swann, McNeil, Greene, and Jones, and established the general locations of those phones throughout the evening of February 14 and the early morning of February 15.

### 1. McNeil's Phone Activity

At 9:22 p.m. on February 14, 2019, McNeil's phone received a call from Greene's phone. At that time, McNeil's phone was using a cell tower that provided coverage to her home. Greene's phone was using a cell tower that served the area around a Food Lion grocery store just north of Swann's house. Shortly thereafter, McNeil's phone began to travel north, in the direction of Swann's house and the Food Lion. While McNeil's phone moved north, Swann's phone called McNeil's phone. During that conversation, which lasted only 97 seconds, Greene's phone called McNeil's phone twice. After disconnecting from Swann's phone, McNeil's phone immediately called Greene's phone.

At 10:06 p.m., Swann's phone again called McNeil's phone. At that time, McNeil's phone was using the same cell tower utilized by Greene's phone—the tower that served the Food Lion grocery store just north of Swann's house. McNeil's phone then traveled south and, at 10:22 p.m., was in the vicinity of Swann's house when Greene's phone called it. Immediately upon disconnecting from Greene's phone, McNeil's phone called Swann's phone. At 10:26 and 10:27 p.m., McNeil's phone sent text messages to Greene's phone. A minute later, McNeil's phone again called Swann's phone.

Between 10:44 and 10:54 p.m., McNeil's phone texted Greene's phone, called the phones of both Greene and Jones, and received a call from Greene's phone, all while it travelled north toward Richmond. Between 11:37 and 11:57 p.m., McNeil's phone attempted to call Jones's phone seven times using a cell phone tower that served a 7-Eleven store on East Laburnum Avenue in Richmond, close to Greene's home. Shortly thereafter, at 12:14 and 12:20 a.m. on February 15, McNeil's phone used two different cell towers to contact Jones's phone; the locations of those towers were consistent with McNeil's phone moving away from the area of the 7-Eleven and toward south Richmond.

After the 12:20 a.m. call, McNeil's phone traveled north and returned to the area around the 7-Eleven on East Laburnum Avenue. Between 12:41 and 12:48 a.m., McNeil's phone called Jones's phone four times and received a call from Jones's phone, which was using the same cell tower near the 7-Eleven it had previously used.

2. Greene's and Jones's Phone Activity

At 9:22 p.m. on February 14, 2019, Greene's phone called McNeil's phone using the cell tower that served the Food Lion just north of Swann's house. Greene's phone remained in the vicinity of that tower until just after 10:00 p.m. Location records for Greene's phone then showed it moving south, until by 10:13 p.m. it was in the immediate vicinity of Swann's house. At 10:22 p.m., Greene's phone still was in proximity to Swann's house when it briefly called McNeil's phone. Greene's phone also received the two text messages from McNeil's phone at 10:26 and 10:27 p.m.

Jones's phone was in contact with the cell tower servicing the Food Lion between 10:21 and 10:38 p.m. on February 14. It then travelled south towards Swann's house before heading north.

From 10:54 to 11:04 p.m., Greene's phone used two different cell phone towers while traveling north toward Richmond. Around 11:20 to 11:22 p.m., Greene's phone was briefly in the

vicinity of Jones's residence before it continued north toward Greene's home in the Treehouse Apartments. Greene's phone then remained near his home from 11:30 p.m. on February 14 until at least 12:28 a.m. on February 15.

Between 11:49 p.m. on February 14 and 12:56 a.m. on February 15, Jones's phone was also in the vicinity of Greene's home. During that time, Jones's phone called McNeil's phone at 12:20 and 12:48 a.m. on February 15. After that, Jones's phone records showed that from 1:05 until 1:17 a.m., his phone was in the area of the 7-Eleven on East Laburnum Avenue.

C. Security Camera Footage

Security footage from the 7-Eleven store on East Laburnum Avenue showed McNeil's black Nissan arriving in the parking lot at 12:44 a.m. on February 15. McNeil entered the 7-Eleven, made a purchase, and drove away at 12:49 a.m. At 12:52 a.m., her car returned to the store and stopped in the same parking spot it had left just minutes before. One minute later, appellant entered the 7-Eleven, went to the register, and then left the store.

At 1:07 a.m. on February 15, Greene's Town Car arrived at the 7-Eleven and parked beside McNeil's Nissan. Appellant got into the rear passenger side of Greene's car. Shortly thereafter, McNeil's Nissan left the parking lot at 1:11 a.m. One minute later, Greene and Jones entered the 7-Eleven. Greene left the store, then reentered it and made a purchase at 1:17 a.m. Five minutes later, his car left the parking lot.

D. Appellant's Statements to Police

While investigating Swann's death, police asked McNeil for an interview. Appellant voluntarily accompanied McNeil to the police station on February 15, 2019, and police interviewed him separately.

During his interview, appellant admitted that on February 14, he and McNeil went to Swann's home so McNeil could purchase drugs from Swann. Appellant said McNeil had set up the

purchase. He was unsure of the time they arrived at Swann's home, but recalled that it was after dark. Appellant stated that in his previous experience, Swann had never conducted drug transactions inside the home, but instead met his customers in the driveway or street or inside a vehicle. He also said that he did not pay much attention to the drug transaction between McNeil and Swann, which occurred inside McNeil's car, because he was busy using McNeil's phone. Appellant explained to police that although he had his own phone, his cellular service had been cut off and thus he could only use his phone if he could connect to a wireless internet signal. After McNeil bought drugs from Swann, appellant said, they went home.

When asked if he had family near Laburnum Avenue in Richmond, appellant stated that his grandmother lived in that area. He then told officers that after McNeil purchased her drugs from Swann, they drove to his grandmother's house. According to appellant, all of the house's lights were off when the couple arrived, so after stopping in front of the house for a couple of minutes, they went home. When confronted with the security camera images from the 7-Eleven on East Laburnum Avenue, appellant then said that he and McNeil had also stopped there to buy cigarettes.

Police conducted a second interview with appellant in September 2020. Appellant stated that on February 14, 2019, he and McNeil drove to Swann's home to purchase Percocet pills, and then to his grandmother's house and the 7-Eleven on East Laburnum Avenue. When shown security camera images from 7-Eleven that depicted him getting into Greene's Lincoln, appellant said that he got into the car to purchase pills from Jones. Appellant identified Jones in the 7-Eleven images and admitted that he knew him through their work at a restaurant. Appellant, however, did not identify Greene.

Police then confronted appellant with the cell phone records that showed communication between Greene's, Jones's, and McNeil's phones. Appellant stated that McNeil had only used her phone to speak with Swann, but that he, appellant, had used McNeil's phone to call Jones and

Greene. Appellant also said that he spoke with Jones before going to Swann's house and that during that conversation, Jones asked him where he was getting his pills. Appellant told Jones he was buying pills from Swann, and Jones indicated that he knew Swann.

Appellant also told police that a few months prior to the September 2020 interview, Jones told him that he and "the other dude" had entered Swann's house; "the other dude was itching to do something, shot [Swann], and then did some stupid shit and took something." Appellant denied knowing Greene or having anything to do with the robbery, and claimed that he did not know Greene and Jones were in the area while he purchased pills from Swann. Appellant acknowledged that he had changed the account he gave to police.

At trial, appellant moved to strike at the close of the Commonwealth's case-in-chief, challenging the sufficiency of the evidence for all the charges. The trial court denied the motion. Appellant declined to present his own evidence and renewed his motion to strike, which was denied by the trial court. The jury convicted appellant for conspiracy to commit robbery, and as a principal in the second degree for robbery and use of a firearm in the commission of a felony. This appeal followed.

## II. ANALYSIS

A. Robbery and Use of a Firearm in the Commission of a Felony as a Principal in the Second Degree

Appellant argues that the evidence was insufficient to prove he acted as a principal in the second degree in the robbery of Swann and the use of a firearm during the robbery.

"In this Court's review of the sufficiency of the evidence, we will not disturb the judgment of a jury unless it is 'plainly wrong or without evidence to support it.'" *Davis v. Commonwealth*, 79 Va. App. 123, 147 (2023) (quoting Code § 8.01-680). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Secret v.*

*Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)).

Appellant contends the evidence was insufficient to prove he acted in concert with anyone to commit a robbery. He argues he was merely present outside Swann's home. Appellant further contends the Commonwealth failed to present any evidence that he kept watch, made plans, or provided any support to Greene and Jones in any plan they had to rob Swann. Although he acknowledges communicating with Greene and Jones on February 14, 2019, as well as meeting them after the shooting, he argues his actions were merely consistent with conducting a drug deal.

"The crime of robbery in Virginia is not defined by statute." *Jones v. Commonwealth*, 70 Va. App. 307, 316 (2019) (en banc) (quoting *Johnson v. Commonwealth*, 209 Va. 291, 293 (1968)). "Consequently, we look to the common law for its definition." *Id.* (quoting *Pierce v. Commonwealth*, 205 Va. 528, 532 (1964)). Under that definition, "[r]obbery is 'the taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation.'" *Pena Pinedo v. Commonwealth*, 300 Va. 116, 122 (2021) (quoting *Butts v. Commonwealth*, 145 Va. 800, 811 (1926)). Robbery may be accomplished by "the defendant alone, or acting in concert with others." *Pugliese v. Commonwealth*, 16 Va. App. 82, 92 (1993). Further, by operation of statute, it is "unlawful for any person to use or attempt to use any pistol, shotgun, rifle, or other firearm . . . while committing or attempting to commit . . . robbery." Code § 18.2-53.1.

"In the case of every felony, every principal in the second degree . . . may be indicted, tried, convicted and punished in all respects as if a principal in the first degree," except in certain homicide offenses. Code § 18.2-18. "A principal in the first degree is the actual perpetrator of the

crime. A principal in the second degree, or an aider or abettor as he is sometimes termed, is one who is present, actually or constructively, assisting the perpetrator in the commission of the crime." *Farmer v. Commonwealth*, 61 Va. App. 402, 414-15 (2013) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 482 (2005)).

"To find a defendant guilty as a principal in the second degree, the Commonwealth must establish that the defendant procured, encouraged, countenanced, or approved the criminal act." *McMorris v. Commonwealth*, 276 Va. 500, 505 (2008). "It is a well-settled rule that a defendant is guilty as a principal in the second degree if he is guilty of some overt act done knowingly in furtherance of the commission of the crime, or if he shared in the criminal intent of the principal committing the crime." *Id.*; Code § 18.2-18. To share in criminal intent has been interpreted to mean that "the accused must either know or have reason to know of the principal's criminal intention and must intend to encourage, incite, or aid the principal's commission of the crime." *Goode v. Commonwealth*, 52 Va. App. 380, 386 (2008) (quoting *McGhee v. Commonwealth*, 221 Va. 422, 427 (1980)). "Mere presence when a crime is committed is, of course, not sufficient to render one guilty as aider or abettor." *Pugliese*, 16 Va. App. at 93 (quoting *Foster v. Commonwealth*, 179 Va. 96, 99 (1942)). However, "proof that a person is present at the commission of a crime without disapproving or opposing it, is evidence from which, in connection with other circumstances," a fact-finder could infer "that he assented thereto, lent to it his countenance and approval, and was thereby aiding and abetting the same." *Id.* at 93-94 (quoting *Foster*, 179 Va. at 100). "The test is whether or not [appellant] was encouraging, in citing [sic], or in some manner offering aid in the commission of the crime. If he was present lending countenance, or otherwise aiding while another did the act, he is an aider and abettor or principal in the second degree." *Farmer*, 61 Va. App. at 415 (quoting *Muhammad*, 269 Va. at 482).

"The Commonwealth can, and most often must, present circumstantial evidence to prove that a defendant aided or abetted in the commission of a crime." *McMorris*, 276 Va. at 506. "On appeal, '[c]ircumstantial evidence is "not viewed in isolation" because "the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable [fact finder]" to conclude beyond a reasonable doubt that a defendant is guilty.'" *Clark v. Commonwealth*, 78 Va. App. 726, 751 (2023) (alterations in original) (quoting *Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019)). Such evidence "is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Id.* at 751-52 (quoting *Holloway v. Commonwealth*, 57 Va. App. 658, 665 (2011) (en banc)).

Here, the facts and circumstances surrounding Swann's death were sufficient for a reasonable fact-finder to conclude that appellant aided and abetted Greene and Jones in robbing Swann, and in using a firearm to do so. Appellant admitted that on the evening of February 14, 2019, he and McNeil drove to Swann's home and bought drugs from Swann, and then drove to a 7-Eleven on East Laburnum Avenue. According to appellant, McNeil used her phone only to communicate with Swann, but appellant used McNeil's phone to speak with Greene and Jones. Thus, a reasonable fact-finder could conclude that appellant and McNeil were together throughout the evening and could infer that whenever McNeil's phone was in contact with the phones of Greene and Jones, appellant was communicating with those two men.

A reasonable fact-finder could then conclude, based upon the evidence from cell phone data analysis, that in the hours before Swann's death, Greene, Jones, and appellant were frequently in contact with one another. This evidence also supports a determination that little more than an hour before Swann was shot and killed, Greene and Jones were in the immediate vicinity of a Food Lion near Swann's home and McNeil was near her home; but then, after receiving a call from Greene, appellant and McNeil drove to the area near the Food Lion from which Greene had placed his call.

A reasonable fact-finder could infer from this evidence that Greene and Jones were together and that Greene had asked appellant and McNeil to meet them at or near the Food Lion to participate in Swann's robbery.

The evidence also supports that shortly after 10:00 p.m., Greene traveled from the area of the Food Lion to Swann's neighborhood and then, at 10:26 and 10:27 p.m., appellant texted Greene just before McNeil called Swann. Around the time that Swann sat in McNeil's car with McNeil and appellant and sold his drugs, Greene and Jones were in the immediate vicinity of Swann's home. Also around that time, both Brown and K.B., Swann's neighbors, heard shouting from the direction of Swann's home, and K.B. and Evans, Swann's uncle, heard a gunshot. Brown then saw a "light color" sedan pull away from Swann's home, make a U-turn, and speed away. Based on these facts and circumstances, taken together with the timing of Evans's 911 call at 10:37 p.m., a reasonable fact-finder could conclude that the robbery and shooting of Swann occurred shortly after Swann sold drugs in McNeil's car.

The evidence additionally supports that after the robbery and shooting, appellant tried to contact Greene and Jones while he and McNeil traveled north toward Richmond. Despite the failure of Greene and Jones to answer appellant's calls, appellant and McNeil traveled to an area near Greene's home; meanwhile, Greene and Jones traveled to the same area. Security camera footage from a 7-Eleven in that area shows that McNeil's Nissan arrived in the store's parking lot at 12:44 a.m. A few minutes later, Greene's light blue Lincoln sedan parked immediately next to McNeil's car; appellant then got into the Lincoln. Based on the totality of their movements and communications, a reasonable fact-finder could conclude that appellant, McNeil, Greene, and Jones had planned to meet at the 7-Eleven on East Laburnum Avenue after participating in the robbery.

Finally, appellant admitted that he changed his story during his interviews with police. He first asserted that after buying drugs from Swann, he and McNeil had driven home, and he only

admitted driving to the area near East Laburnum Avenue after police asked him if he had family in that area. Likewise, he only admitted going to the 7-Eleven and meeting Jones and Greene after he was confronted with the security camera images from the store. Appellant also stated he did not know Greene, but later acknowledged calling him. A reasonable fact-finder could infer from appellant's inconsistent statements that he possessed a consciousness of guilt and was attempting to cover up his participation in the robbery. *See Jones v. Commonwealth*, 279 Va. 52, 57 (2010) ("In our jurisprudence, the term 'consciousness of guilt' generally is applied to affirmative acts of falsehood or flight immediately following the commission of a crime, which tend to show a person's guilty knowledge of, and participation in, a criminal act."); *Marsh v. Commonwealth*, 57 Va. App. 645, 655 (2011) ("A defendant's false statements are probative to show he is trying to conceal his guilt, and thus is evidence of his guilt." (quoting *Emmett v. Commonwealth*, 264 Va. 364, 372 (2002))).

When viewed in the light most favorable to the Commonwealth, and granting the Commonwealth all reasonable inferences, a reasonable fact-finder could conclude beyond a reasonable doubt that appellant knew Greene and Jones planned to rob Swann, was in the vicinity of Swann's home just before the robbery, and assisted their robbery by coordinating their movements with the drug purchase that lured Swann out of his home. Thus, appellant assented and lent his countenance and approval to the robbery, "thereby aiding and abetting the same." *Pugliese*, 16 Va. App. at 94 (quoting *Foster*, 179 Va. at 100). Accordingly, the jury was neither plainly wrong nor without supporting evidence when it convicted appellant for the robbery of Swann and the use of a firearm in the commission of that robbery, as a principal in the second degree.

B. Conspiracy to Commit Robbery

Appellant's sole assignment of error alleges that the trial court erred in convicting him of conspiracy to commit robbery and additional offenses because the evidence was insufficient "to

prove that he was a principal in the second degree." Based on this assignment of error, appellant

argues that the evidence at trial failed to demonstrate he was part of a conspiracy to commit robbery.

We cannot reach the merits of appellant's conspiracy argument, because his assignment of error

encompasses only those offenses for which he was convicted as a principal in the second degree,

and he was not so convicted for conspiracy.

Appellant's indictment for conspiracy to commit robbery alleged that appellant "did

unlawfully and feloniously conspire, confederate, or combine with another . . . to commit a

felony . . . to-wit: robbery of . . . Swann." Thus, appellant was charged as a party to the

conspiracy—i.e., as a perpetrator, or principal, in the first degree. The conspiracy instruction

given to the jury reflected this charge.[3] Since appellant's sole assignment of error on appeal

challenges the sufficiency of the evidence "to prove that he was a principal in the second

degree," and appellant was neither tried nor convicted for conspiracy as "a principal in the

second degree," his sufficiency argument with respect to conspiracy is not properly before the

Court. *See Moison v. Commonwealth*, 302 Va. 417, 420 (2023) (order) ("[T]he purpose of

assignments of error is to point out the errors with reasonable certainty . . . and to limit

discussion to these points." (quoting *Yeatts v. Murray*, 249 Va. 285, 290 (1995))); *id.* (noting that

the language of an assignment of error "cabins the error that [appellate courts] can consider");

*Forest Lakes Cmty. Ass'n, Inc. v. United Land Corp. of America*, 293 Va. 113, 123 (2017) ("A

properly aimed assignment of error must 'point out' the targeted error and not simply take 'a shot

---

[3] Jury Instruction No. 12 provided that to convict appellant for conspiracy, the jury had to find proof beyond a reasonable doubt of three elements: that "[appellant] entered into an agreement with one or more other persons"; "the agreement was that they were to commit the robbery of . . . Swann"; and "both [appellant] and at least one other party to the agreement intended to commit robbery." By contrast, the instructions given to the jury on robbery and use of a firearm in the commission of a felony each included, in addition to the basic elements of those offenses, the element that appellant "was a principal in the second degree." The jury was separately instructed on what constitutes a principal in the second degree.

into the flock' of issues that cluster around the litigation." (quoting *Plant Lipford, Inc. v. E.W. Gates & Son Co.*, 141 Va. 325, 332 (1925))); *Banks v. Commonwealth*, 67 Va. App. 273, 290 (2017) ("[W]e do not consider issues touched upon by the appellant's argument but not encompassed by his assignment of error."); Rule 5A:20(c) (requiring an appellant's opening brief to identify, in its assignments of error, "the specific errors in the rulings below . . . upon which the party intends to rely").

## III.  CONCLUSION

We hold the that the evidence was sufficient to convict appellant, as a principal in the second degree, for robbery and use of a firearm in commission of a felony.  We further find that appellant's challenge to his conviction for conspiracy to commit robbery is not before this Court, as it is not encompassed by his assignment of error.  Accordingly, we affirm the trial court's judgment and uphold appellant's convictions.

*Affirmed.*