COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Athey and Callins
Argued at Virginia Beach, Virginia

PUBLISHED

WILLIAM GARY SHAHAN

                                    OPINION BY
v.      Record No. 1098-21-1      JUDGE ROBERT J. HUMPHREYS
                                    DECEMBER 13, 2022

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Michelle J. Atkins, Judge[1]

Kristin Paulding (7 Cities Law, on brief), for appellant.

Leanna C. Minix, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


William Gary Shahan challenges his convictions for first-degree murder, in violation of

Code § 18.2-32; robbery, in violation of Code § 18.2-58; and two counts of use of a firearm in

the commission of a felony, in violation of Code § 18.2-53.1.  Specifically, he asserts that (1) the

circuit court erred in excluding evidence of a civil suit Shahan filed against the City of Norfolk

and members of the Norfolk Police Department and (2) the evidence was insufficient to prove

that he was the person who robbed and killed the victim.

BACKGROUND

We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing

party in the trial court." *Commonwealth v. Cady*, 300 Va. 325, 329 (2021) (quoting

*Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)).  Doing so requires that we "discard the

evidence of the accused in conflict with that of the Commonwealth, and regard as true all the

---

[1] Judge Jerrauld C. Jones ruled on the Commonwealth's motion *in limine*.

credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Id.* (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

A grand jury indicted Shahan in March 2019 on charges of murder and robbery of Clifford Duty and two counts of use of a firearm in the commission of a felony. Prior to trial, the Commonwealth filed a motion *in limine* to prohibit Shahan from introducing evidence of a civil lawsuit he filed on December 20, 2018, against the City of Norfolk and Norfolk Police Detectives William Cogswell and Matthew Nordan. In the civil complaint, Shahan asserted claims for defamation, false imprisonment, and intentional infliction of emotional distress, alleging that Cogswell and Nordan had unlawfully arrested, detained, and interrogated him in June 2018 as part of their investigation of the crimes against Duty. The Commonwealth argued that evidence of the suit was irrelevant, would be unduly prejudicial, and would confuse or mislead the jury. Shahan responded that evidence of the suit was relevant and tends to show that he did not commit these crimes for two reasons. First, he argued that it demonstrated police bias, in part because the indictments, which listed Nordan as a grand jury witness, issued only six days prior to the first scheduled hearing in the civil suit, set for March 12, 2019. Second, he argued that the suit was evidence of Shahan's innocence because, if Shahan were guilty, he likely would not have been "willing to be the face of a lawsuit" against the police.

In conversing with counsel, the circuit court commented that the mere fact of Shahan filing the lawsuit did not seem "relevant to the elements of proof" of the offenses with which Shahan was charged. The circuit court considered that one "can file a civil suit fraudulently, in bad faith, knowing full well that he's guilty of the offense." The circuit court stated that the evidence of the lawsuit would likely "confuse the issues that the jury [would] be required to find." In sum, the circuit court stated the essence of the issue is whether to allow evidence in

that may cause unfair prejudice. The circuit court's written order granted the Commonwealth's motion and excluded the evidence of the lawsuit "for reasons stated to the record."

The case proceeded to a jury trial, where the parties presented the following evidence. Clifford Duty dated Jennifer Outten intermittently for approximately five years. On Sunday, January 28, 2018, Outten called Duty and left a voice message. Outten called Duty on Monday, January 29 around the middle of the day and again in the evening but still received no answer. She testified that, beginning either on Monday evening or the morning of Tuesday, January 30, her calls to Duty "went straight to voicemail" and her text messages to him were recorded as sent but not delivered.

Concerned that "something wasn't right," Outten drove to Duty's apartment on Wednesday, January 31. Outten knocked on the locked door and yelled for Duty but only Duty's dog came to the door. Outten left to retrieve a key to Duty's apartment and returned to the apartment with a friend. Upon entering, they found that the entire apartment was disheveled and that cabinet doors and containers of protein powder and vitamins were open. Outten's friend found Duty lying on the dining room floor surrounded by a pool of blood and called 911.

Police officers and paramedics found Duty dead with two gunshot wounds to his head. Lividity and rigor mortis had already set in. Paramedic John Lara testified that the lividity "would take a while" to occur, but he could not provide an exact time frame. Cogswell testified that, in his experience investigating homicides, Duty had been dead for two to four days. Medical Examiner Elizabeth Kinnison performed the autopsy and determined that Duty died from two gunshot wounds, one which entered his right cheek and one which entered behind his left ear and penetrated his brain. She could not determine Duty's time of death and explained that a variety of biological and environmental factors would affect the rate of the body's decomposition.

- 3 -

Duty had made money by selling marijuana since 1999. Outten knew that Duty hid marijuana and cash throughout his house and had been robbed at least twice before. Joseph Turpin testified that he bought marijuana from Duty in public for about a year and then purchased marijuana from Duty in Duty's apartment for about sixteen years. Duty kept marijuana and cash in various containers which he sometimes showed Turpin. In 2014 or 2015, Duty showed Turpin an Altoids tin in which he claimed to be able to fit $9,000. During the investigation of this case, police found an empty Altoids tin in the sink in Duty's bathroom.[2]

Daniel Grabenschroer was Duty's upstairs neighbor for about a year before the murder. He testified that he saw Duty "[a]t least once or twice a day" while they were neighbors and last saw him on January 28, 2018, around 9:00 a.m. Grabenschroer passed by Duty's back door later that evening and noticed that the window was covered up, the blinds were closed, and the lights inside the apartment were turned off. Grabenschroer testified that he had never known Duty to cover the window or close the blinds. Grabenschroer went to work early Monday morning and returned home around 5:00 p.m. to find that the lights in Duty's apartment were still off and his blinds were still closed. Grabenschroer heard Duty's dog crying "for multiple days" after that.

Norfolk Police Detective Michael Mezo reviewed January 2018 call logs for Duty's phone, which showed contacts between Duty and Shahan on January 27 and 28. In the week following discovery of Duty's body, police obtained historical cell site data for Duty's and Shahan's cell phones. Shahan and Duty first made phone contact that month on January 27.

---

[2] The police lifted fingerprints and swabbed various items in the apartment for DNA, including the Altoids tin in the bathroom and eleven lids to containers that had been left opened. They recovered no fingerprints of value other than Duty's. A swab of the zippers and pocket of the jacket Duty was wearing when he died resulted in a DNA mixture profile that was suitable for analysis. After police obtained Shahan's DNA in June 2018, Shahan was eliminated as a contributor to the DNA mixture profile.

They had four phone contacts on January 27 and twenty contacts on January 28.[3] Duty first called Shahan on January 28 at 8:23 a.m.; at that time Shahan was near his own home. Shahan's wife called him at 10:50 a.m.; at which time Shahan was near Duty's home. Shahan's wife called him again at 12:15 p.m.; Shahan was still near Duty's home.

Mezo testified that Duty's phone was recorded traveling south on Hampton Boulevard at 12:31 p.m. and 12:35 p.m. Video footage captured Shahan's wife's van ("van") traveling south on Hampton Boulevard at the same time. Duty's phone was recorded heading south toward the Midtown Tunnel at 12:35 p.m. At 12:37 p.m., the van's license plate number was photographed entering the Midtown Tunnel. Duty's phone was located in the Port Norfolk area of Portsmouth from 12:41 p.m. until 12:58 p.m. before proceeding through the Downtown Tunnel from 1:09 p.m. until 1:12 p.m. The license plate reader at the Downtown Tunnel captured the van entering the Downtown Tunnel at 1:09 p.m. Duty's phone ceased all activity at 1:12 p.m., after which there were twenty-six attempted calls and three text messages made to the cell phone. None of these attempted contacts came from Shahan. The police were unable to recover Duty's phone.

Norfolk Police Detective Christopher Beason testified that Shahan's cell phone had no saved text messages from June 4, 2016, until February 1, 2018, and no saved calls from June 4, 2016, until March 13, 2018. According to Beason, this suggested that Shahan had selectively deleted the data for those time frames.

Shahan's father, Gary Shahan ("Gary") reported his Taurus .38 caliber handgun stolen on February 20, 2018. Gary reported that he had last seen his handgun on February 2, 2018, in one of his desk drawers at the business he ran and at which Shahan worked. He admitted that he left

---

[3] Duty had four contacts with another phone on January 27 and fifteen more contacts with that phone on January 28. Mezo did not know to whom that phone belonged.

the firearm in his office or truck sometimes and that Shahan would have access to it there. Firearms Examiner Allison Milam testified that the bullets recovered from Duty's body were either caliber .38 Special or .357 Magnum lead bullets and fired from either a Ruger, Smith & Wesson, or Taurus revolver.

The Commonwealth also introduced evidence about Shahan's financial circumstances. Equifax records indicated that at the time of the murder, Shahan was $19,700 in debt and had a minimum payment due of $791 on his credit card. Shahan received a weekly check from his father's business for amounts between $600 and $800. On January 25, 2018, Shahan had $0 in his checking account and $5 in his savings account; he deposited $1,000 in cash on January 29, 2018. By February 8, Shahan made a credit card payment of $718. Shahan was the sole provider for his wife and children.

On June 12, 2018, Shahan was detained as a suspect and Cogswell interviewed him. Shahan told Cogswell that he had last seen Duty on a weekend after Christmas. Shahan believed that he had contacted Duty on a Friday and met him on a Saturday. Shahan told Cogswell that he purchased $50 in marijuana from Duty, that they talked and smoked together between 8:30 and 9:00 a.m., and then Shahan said goodbye and left. Shahan said he was driving his wife's van. He initially told Cogswell that he went from Duty's house to "Justin's" house but when pressed admitted that he first went to "Vinny's" house in Port Norfolk by way of the Midtown Tunnel. Shahan said he had been to Duty's house forty to fifty times over the last eight years that he had known him. The police released Shahan and referred the case to the Commonwealth's Attorney's Office which ultimately sought the indictments from the grand jury.

Shahan testified at trial that he had purchased marijuana from Duty at Duty's apartment since 2009. He contacted Duty on Saturday afternoon, January 27, 2018, and had last seen Duty before Christmas. Duty called Shahan on Sunday morning, and they arranged for Shahan to

purchase marijuana at Duty's apartment that morning. Shahan drove to Duty's apartment, and they smoked marijuana together. Shahan purchased some marijuana for his personal use and purchased another pound with plans to sell half to "Vinny" and half to "Justin." He testified that at the end of the deal he shook hands with Duty and left.

Shahan testified that he had no major financial concerns in January 2018, received a weekly paycheck, and received supplemental income from tattooing and selling marijuana. He testified that the $1,000 deposit on January 29 was cash he received from tattoo work and from selling marijuana to Vinny and Justin. He further testified that he did not know where Duty kept cash in his apartment.

The jury convicted Shahan of all charges. Shahan now appeals the ensuing judgment of conviction.

## ANALYSIS

### I. Motion *in Limine*

Shahan first contends that the circuit court erred when it granted the Commonwealth's motion *in limine* to exclude any mention of the civil suit that Shahan filed against the Norfolk Police detectives. He argues that his filing of the civil suit was relevant evidence to the issue of identity and its probative value was not substantially outweighed by the danger of unfair prejudice, and it would not confuse or mislead the jury.

"It is well-settled that decisions regarding the admissibility of evidence lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion." *Nottingham v. Commonwealth*, 73 Va. App. 221, 231 (2021) (cleaned up) (quoting *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019)). "A court has abused its discretion if its decision was affected by an error of law or was one with which no reasonable jurist could agree." *Tomlin v. Commonwealth*, 74 Va. App. 392, 409 (2022).

Evidence is relevant if it has "any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." Va. R. Evid. 2:401. "Evidence is relevant if it has any logical tendency, however slight, to prove a fact in issue in the case." *Jenkins v. Winchester Dep't of Soc. Servs.*, 12 Va. App. 1178, 1186 (1991). Relevant evidence is generally admissible. Va. R. Evid. 2:402. Identity of the assailant is a relevant fact of the offense charged, *Berry v. Commonwealth*, 22 Va. App. 209, 212 (1996), and is the only issue contested by Shahan.

Shahan contends that the evidence of his civil suit was relevant for two reasons. First, he argues that it showed police "investigatory bias" toward him because it was only after Shahan sued them that he was charged with the crimes against Duty. Second, he argues that the lawsuit bolsters his claim of innocence because a guilty person would likely avoid confrontation with the police and not confront them with a lawsuit.

The fact that Shahan filed a civil suit against the police investigators proves only that; it does not tend to prove or disprove who committed the crimes Shahan was charged with. Shahan argues he would have offered this evidence in order to argue inferences from the fact of the civil lawsuit. "Inferences and presumptions are a staple of our adversary system of factfinding." *Cnty. Court of Ulster Cnty., N.Y. v. Allen*, 442 U.S. 140, 156 (1979). "[A] factfinder may 'draw reasonable inferences from basic facts to ultimate facts,' unless doing so would push 'into the realm of *non sequitur*.'" *Holloway v. Commonwealth*, 57 Va. App. 658, 664 (2011) (en banc) (citations omitted). "An inference loses its rationality . . . when it becomes so attenuated as to appear to stand alone, deriving none of its probative strength from the proven basic facts." *Thomas v. Commonwealth*, 48 Va. App. 605, 608 (2006). The inferences Shahan would have proposed to the jury based on the filed lawsuit were that the police were biased against him in their investigation and that he would not have filed the lawsuit if he was guilty, and ultimately

that Shahan did not kill Duty. These inferences are so attenuated from the basic fact that Shahan filed a civil lawsuit against the police that they are purely speculative and thus irrational. As the circuit court noted, Shahan could have filed the civil suit "fraudulently, in bad faith, knowing full well that he's guilty of the offense." Therefore, the mere filing of the civil lawsuit is irrelevant and not admissible.[4] For these reasons the circuit court did not abuse its discretion in granting the Commonwealth's motion *in limine*.

## II. Sufficiency of the Evidence

Shahan next contends that the evidence was insufficient to support the jury's finding that he was the person who robbed and killed Duty. "At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)). "On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v.*

---

[4] Virginia Rule of Evidence 2:403(a) provides that even relevant evidence may be excluded if its probative value is "substantially outweighed by (i) the danger of unfair prejudice, or (ii) its likelihood of confusing or misleading the trier of fact." Here, our analysis ends with a finding that the proposed evidence is not relevant and excluded on that ground. However, we note that even if the evidence were marginally relevant, its likelihood of confusing or misleading the trier of fact would outweigh any probative value. Shahan's civil suit asserting police misconduct "tends to draw the minds of the jury away from the point in issue, to excite prejudice and mislead them." *Spurlin v. Richardson*, 203 Va. 984, 990 (1962).

Introducing into evidence Shahan's civil allegations against the police risks confusion of the issues for the jury by diverting attention away from the elements of the crimes charged against Duty. Upon Shahan's introduction of his claims of defamation, false imprisonment, and intentional infliction of emotional distress, there would have been a substantial risk that the jury's attention could have been improperly focused on the elements of proof for these civil claims, Shahan's likelihood of prevailing on the civil claims, and Shahan's possible motivations for filing the civil suit. Such an inquiry would have the potential to create a side trial where the jury considers the merits of civil claims that have different elements and a different standard of proof than the criminal charges at issue. Furthermore, introducing evidence of the existence of a suit claiming police misconduct would invite the jury to decide the case based on the conduct of the police investigation rather than whether Shahan committed any of the offenses charged.

*Commonwealth*, 296 Va. 450, 460 (2018)). We "review the evidence in the light most favorable to the Commonwealth, as the prevailing party below, and determine whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Farmer v. Commonwealth*, 61 Va. App. 402, 416 (2013) (quoting *Commonwealth v. McNeal*, 282 Va. 16, 20 (2011)). "Furthermore, we accord the Commonwealth the benefit of all inferences fairly deducible from the evidence." *Id.* (quoting *Brooks v. Commonwealth*, 282 Va. 90, 95 (2011)). We review the fact finder's determination regarding the identity of the perpetrator considering "the totality of the circumstances." *Brown v. Commonwealth*, 37 Va. App. 507, 523 (2002) (quoting *Satcher v. Commonwealth*, 244 Va. 220, 249 (1992)).

A reasonable fact finder could conclude that Shahan killed Duty on Sunday, January 28, 2018, during the time Shahan admits he was present at Duty's apartment. Assessing the evidence in the light most favorable to the Commonwealth, Shahan left Duty's apartment shortly after noon on Sunday with Duty's cell phone, a fact which Shahan was unable to explain during his testimony. Video and photographic evidence, including license plate readers, showed that Shahan's wife's van traveled the route that Duty's cell phone traveled at the same time until Duty's cell phone went permanently offline at 1:12 p.m. There is no evidence that anybody was able to contact Duty after that point, nor is there any evidence that anybody saw Duty alive after that point. Duty's apartment neighbor, Grabenschroer, saw him alive the morning of January 28, but did not see Duty the rest of the day despite being home all day. Later that evening, the lights in Duty's apartment were off, the window was covered, and the blinds were closed, which Grabenschroer testified he had never seen happen during his time as Duty's neighbor. The handgun reported missing by Shahan's father was accessible to Shahan, and the bullets recovered from Duty's body are characteristically consistent with those fired from that brand of handgun. Finally, investigators indicated that Duty had been dead for some time, around two to four days,

before his body was discovered Wednesday evening, January 31. From this evidence, a reasonable fact finder could conclude that Duty died on Sunday, January 28.

Shahan argues that the DNA mixture from the pockets of Duty's jacket did not match Shahan's DNA, and thus demonstrates that somebody else killed Duty. Although such evidence supports Shahan's claim of innocence, it is by no means dispositive. "[M]erely because [a] defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded. What weight should be given evidence is a matter for the [factfinder] to decide." *Edwards v. Commonwealth*, 68 Va. App. 284, 301 (2017) (second and third alterations in original) (quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004)). The appellate court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution." *Wright v. West*, 505 U.S. 277, 296-97 (1992) (quoting *Jackson v. Virginia*, 443 U.S. 307, 326 (1979)). The lack of DNA evidence implicating Shahan must be weighed against the evidence pointing to Shahan's guilt such as the evidence regarding the stolen firearm and Shahan's unexplained possession of Duty's phone around the time of his death. The jury had a full opportunity to consider Shahan's argument about the DNA on Duty's jacket pocket and ultimately found him guilty notwithstanding that argument. We see no basis to overturn the jury's determination.

Finally, Shahan challenges the weight of the Commonwealth's argument that Shahan's debts provided motive for the robbery and murder. The Commonwealth is not required to prove motive as an element of the offense. While intent "is a requisite element in many crimes, . . . motive is not. Motive is merely a circumstance tending to prove the guilt of the alleged perpetrator, as its absence may tend to show his innocence." *Tibbs v. Commonwealth*, 31

Va. App. 687, 704 (2000) (quoting *Cantrell v. Commonwealth*, 229 Va. 387, 397 (1985)). The question of whether Shahan's financial circumstances were poor enough to provide motivation for him to kill Duty falls firmly within the fact finder's prerogative, not this Court's. Once again, the jury considered Shahan's arguments and rejected them. We cannot conclude that no reasonable jury could do so.

Accordingly, we find that sufficient evidence supports Shahan's convictions.

CONCLUSION

For the foregoing reasons, we hold that the circuit court did not err in excluding evidence of the existence of a civil lawsuit and in concluding that the evidence was sufficient as a matter of law to support Shahan's convictions. We therefore affirm the circuit court's judgment.

*Affirmed*.