COURT OF APPEALS OF VIRGINIA

Present: Judges Fulton, Ortiz and Lorish
Argued at Norfolk, Virginia


ADRIAN SALVATORE LEWIS

                                         MEMORANDUM OPINION* BY
v.       Record No. 0219-24-1                 JUDGE LISA M. LORISH
                                               JULY 22, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Bryant L. Sugg, Judge

Samantha Offutt Thames, Senior Appellate Attorney (Virginia
Indigent Defense Commission, on briefs), for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Adrian Salvatore Lewis challenges his conviction for the first-degree murder of his wife,

Shanita Eure-Lewis, whose body was never recovered. Adrian asks us to reverse his conviction

because there was insufficient evidence that his wife died, or that he caused her death. He also

argues that the trial court erred in denying his motion to suppress and challenges several of the

court's decisions at trial. We find there was sufficient evidence to convict Adrian, and that the

trial court did not err in denying his motion to suppress and did not make any decision at trial in

a manner that harmed him. For these reasons, we affirm his conviction.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND[1]

Adrian and Shanita were married in April 2010 and, until July 2022, lived together with their two sons in Newport News. In the months leading up to that July, Shanita and Adrian's relationship deteriorated. In December 2021, Adrian told friends at a party that he would kill Shanita if she ever cheated on him. The following summer, Shanita began telling friends and family that she wanted to get divorced. Also during that summer, Adrian told friends and family that he believed Shanita was having an affair with her podiatrist, Dr. Carlos Myers.

On July 5, 2022, Shanita told her sister, Deidra Eure, that she wanted to divorce Adrian. Shanita then brought guns over to Deidra's house because she was worried that Adrian was going to kill himself. On July 8, Adrian called Mitchell Foreman, a friend of the couple, to tell him Shanita wanted a divorce. Adrian thought that Shanita must be cheating on him because he had done nothing wrong. Adrian told Mitchell that he had put so much time and money into the relationship that he could not let her walk away from it and that since he was "from the streets," he would handle it the "street way." On July 9, someone used Adrian's phone to Google "will shooting someone at point-blank range in the back paralyze them."

On July 10, Adrian went to church for the first time since 2020. Shanita complained to Mitchell that Adrian was smothering her and that the one place she could get away from him was church. On July 11, Adrian reported that Shanita was upset because he had put an AirTag in her car. He also told Mitchell that he intended to track Shanita's phone in order to see all of her incoming phone calls and text messages. On July 12, Shanita told Mitchell's wife, Tiffany Foreman, that she wanted to get divorced. That same day, there was a search on Adrian's phone for "what sentence does a murder charge have in Virginia." Later the same day, there were

---

[1] We review the evidence in the light most favorable to the Commonwealth, the prevailing party below. *Shahan v. Commonwealth*, 76 Va. App. 246, 258 (2022).

searches for "how to get text messages from another phone sent to mine," "can an overdose on blood pressure medicine cause death," and "private investigators near me." On July 13, Shanita called Tiffany and told her that Adrian wanted to kill himself. She also texted Mitchell and told him that Adrian was tracking her phone. The same day, Adrian called Tiffany and asked whether he "was getting ready to lose [his] wife." On July 14, there were searches on Adrian's phone for "do you die instantly from a gunshot to the head, do you feel any pain at all," "what would kill you faster, a shot through the roof of your mouth or back of the head," and "[w]ill a bullet to through the brain kill you."

At the time, Adrian was also in frequent contact with Tomeka Davis, with whom he had been in an on-and-off sexual relationship over the previous few years. In July 2022, Adrian told her that he suspected that his wife was cheating on him, that she had told him that he was not the father of their two sons, and that she wanted to get divorced. He thought she was cheating because she would get up in the middle of the night and be on her phone "all through the night." He told Davis that if he ever caught Shanita cheating, he would hurt her and that he would pawn his wedding ring to get a gun. He had also told her that he would flee to Jamaica. On July 13, Adrian went over to see Davis and she thought he seemed intoxicated. He had a gun and said that he was looking for his wife. He was trying to text Shanita, but the text messages would not go through. Davis told him that he should not be out driving while intoxicated and that he should go home. The next day, he texted Davis that she had "saved her for a night," but that "if she don't act right tonight, she's done."

Shanita was an active member of the Gethsemane Baptist Church, to which she had belonged since she was a child. On the morning of July 17, 2022, Shanita attended the 8:00 a.m. church service in a light-colored pant suit. During the service, Shanita made an announcement, encouraging parishioners to attend an event that she had planned for later in the week. Shanita

told another church member that she was leaving the church but would return to make the same announcement at the 10:00 a.m. church service. Shanita never returned to church that morning.

Also on the morning of July 17, Adrian called Deidra and asked her if Shanita was cheating on him. He said that he had pulled their T-Mobile records and discovered that Shanita had sent someone over 300 text messages in the early morning hours. He asked Deidra to look after his children and implied that he was going to hurt both himself and Shanita. He then called Dr. Myers while he was still on the phone with Deidra and asked him if he was sleeping with his wife. Deidra heard Adrian tell Dr. Myers that he would take his word for it.

That same morning, Adrian told his 15-year-old son, C.L., that he had found phone logs showing Shanita talking to her podiatrist at night. Later in the morning, C.L saw his mother arrive back at home. After she spoke to Adrian for a while, C.L. saw her get into his truck and the two drove off.[2] That was the last time he ever saw his mother. His father returned about 30 to 40 minutes later and told C.L. that Shanita was not with him and that "she was out in the neighborhood walking around." Later that day, C.L. saw his father collecting credit cards and passports at their home. Adrian said that he was leaving for Jamaica to visit a friend there and said Deidra would take care of him and his brother. He had never mentioned taking a trip to Jamaica before that day. C.L. texted his mother but never got a response. That afternoon, he saw Adrian gathering jewelry, including some of his mother's jewelry.[3] Adrian then left the house in his truck and did not return.

---

[2] A surveillance camera at a Little Caesars restaurant captured Adrian pulling his truck into the parking lot behind the store around 9:38 a.m. The surveillance tape shows Adrian wiping down the interior of his truck. The video also captures a glimpse of a light-colored object in Adrian's truck; that item was not moving and was consistent with a person sitting in the passenger seat.

[3] Adrian later went into the pawn shop, looking to sell five rings and a necklace. When an employee asked where the women's rings were from, Adrian "referenced a cheating wife."

Around 1:00 p.m. that afternoon, Adrian called Mitchell and said, "It's over," and that he wanted Mitchell to look after his boys. He said he would take all of his money and go "to Mexico to live on the beach." He elaborated that Shanita told him that she wanted him out of their house and that she had admitted to cheating on him. He said that when they were driving in his truck, Shanita threw her phone at him and got out of the truck and started walking down the street near a Wawa. Adrian also said he had seen text messages between Shanita and her podiatrist that proved she was cheating and that he had used Shanita's cell phone to send Deidra text messages pretending he was Shanita. Adrian sent Mitchell a screenshot of the texts allegedly sent between Shanita and the podiatrist.

After hanging up with Adrian, Mitchell called Deidra to tell her that Adrian was pretending to be Shanita during their text conversations. Mitchell also texted the number that appeared to belong to the podiatrist in the screenshot Adrian had sent him to see if Shanita was with him. Adrian called him ten minutes later and read the text message Mitchell had just tried to send to Dr. Myers word-for-word, asking if Mitchell was the one who sent it. Mitchell said that he texted the podiatrist because he wanted to check on Shanita. Adrian said that the number did not actually belong to the podiatrist, but was Adrian's "people's number that [he] had working with [him] on some stuff."

Adrian called Deidra again that afternoon and told her that Shanita had jumped from his truck near Wawa and said he was wondering if Deidra had seen her or heard from her. Earlier that day, Deidra got a text message from Shanita saying, "I cheated on Adrian with Carlos, and I don't know how to tell him." Deidra thought this was odd and immediately tried to call Shanita, but she did not answer and instead texted that she did not want to speak right then. Deidra found this unusual because Shanita typically answered Deidra's calls, even if only to say that she was busy. Deidra then texted Shanita and asked her where she was and whether she could come pick

her up. Shanita responded that she was walking down the road and needed to clear her head. Deidra later learned from Mitchell that Adrian had been texting Deidra from Shanita's phone, pretending to be her.

Concerned for her sister, Deidra drove around to look for Shanita in the area where Adrian said he last saw her. As she was driving, she saw Adrian in a parking lot putting things into a dumpster. He was drenched in sweat. Later that afternoon, he told Deidra that he had called Doreen, Shanita's friend, and that Doreen told him that she had spoken with Shanita. But Deidra had already called Doreen who said she had not seen or spoken with Shanita that day. Deidra tried to call Shanita again; her calls went straight to voicemail.

That afternoon around 2:00 p.m., Adrian called Darrell Witts, a friend of his who worked as a mobile car detailer.[4] Adrian asked Witts to shampoo his truck seat for him because "his neighbor had shot his dog."[5] Adrian brought his truck to the Relax Inn, where Witts was staying. Witts testified that when he looked at the passenger seat, he saw "a jelly type substance" that appeared "reddish." After cleaning the car, he threw the rags he had used in the motel dumpster. Adrian then asked Witts to watch his truck for him while he went out of town for a few days.

Around 3:00 p.m., Adrian called Pastor Dwight Riddick, whom Shanita and Adrian had been seeing for marriage counseling. Adrian told him that he had confronted Shanita with text messages on her phone and that she had admitted to cheating on him, thrown her phone at him, and jumped out of the car. Riddick called Adrian later in the evening to ask about Shanita's whereabouts and Adrian said that he did not know where she was because he had gone to

---

[4] Adrian had previously texted Witts on July 15 and told him that he was having troubles with his wife and that he "might have to get ugly" but that he did not need to get Witts "involved or in trouble."

[5] C.L. later testified that neither of the family's two dogs were ever injured around the time of his mother's disappearance.

Virginia Beach to stay with a friend. Adrian told Riddick that he "hope[d] that she [would] rot in hell."

Late in the afternoon, Adrian went over to Deidra's with a suitcase and said he was planning to leave since Shanita did not want him there. Deidra asked him to go with her to the police station to report that Shanita was missing, but Adrian told her that a person could not be reported missing until they had been gone for 48 hours. After Adrian left, Deidra called the police. She told the police about seeing Adrian at the dumpster earlier that day. She took them to the dumpster, and they searched it. They found a clutch purse that had belonged to the sisters' grandmother and that Shanita had carried, shoes that Shanita had just bought the weekend prior, a pair of Shanita's sandals, a shovel, a moving blanket, and a binder and mail with Adrian and Shanita's names on it.

That evening, Adrian had Witts drive him to the Norfolk Airport. Although Shanita's cell phone was close to Adrian's cell phone for much of the day, the last location detected for Shanita's cell phone was in the area of the Hampton Roads Bridge Tunnel at 6:19 p.m. on July 17. Her cell phone was never found. Adrian called Davis around 9:00 p.m. and said that "he didn't care if [Shanita] got hit by a truck." When Davis responded that he should not have said that, Adrian said, "I did it." She said, "You did what?" He replied, "Oh, nothing. I'm just playing."

Adrian's cell phone was in the area of the Dulles International Airport at 11:40 p.m. At 2:37 a.m. the following morning, Adrian searched, "does TSA check for warrants at the airport?" and "does Jamaica have extradition." Adrian's flight to Jamaica was scheduled to depart at 12:30 p.m. on July 18.

While Adrian was at Dulles waiting for his flight, he had a two-hour-long conversation in a lounge with another traveler, Darin Frihat. He told Frihat that he was going to attend a friend's

wedding and that his wife had gone missing the day before. When Adrian spoke of his wife, he used the past tense. He said that they had an argument the day before after they left church in his truck because she was cheating on him. He pulled up phone records to show Frihat that his wife and the man he believed she was having an affair with had exchanged between 300 and 400 text messages at nighttime. He told Frihat that he had called the man and asked him why he was talking to his wife and the man had told him that he did not believe she was married. Adrian told Frihat that he felt "numb," and said at least five times that he did not "care what happened to [his wife], if she got killed or hit by a truck or trailer." He said that his wife's sister had called him and was "accusing him of killing her" and that he had told her that he needed to leave to go attend a wedding. When Adrian left the lounge to go check on his flight, Frihat approached an airport hostess and asked for help because she was afraid of Adrian.

Around this time, Newport News police officers learned that Adrian had purchased a plane ticket from Norfolk to Dulles and then from Dulles to Jamaica, to depart on July 18. They informed the Department of Homeland Security and airport security that the police department was getting search warrants for Adrian's cell phone and luggage and asked them to stop him if he showed up for his flight. A special agent for Homeland Security Investigations located Adrian at his airport gate for the flight to Jamaica. Agents took his cell phone and his luggage and escorted him to a private interview area. Detective Michael Scrimgeour and Detective Derrick McCord from Newport News Police Department arrived shortly thereafter.

Detectives Scrimgeour and McCord were led to the room where Adrian was. When they spoke to Adrian, he was "calm and polite." They engaged in a short conversation. During the brief interview, Adrian said that he knew that it did not look good for him that he was the last person his wife had been in contact with before she went missing. He also acknowledged that it looked bad that he left home to fly to Jamaica despite knowing that his wife was missing but that

he was going to visit family there. The detectives executed a search warrant and searched the contents of Adrian's backpack. Inside, they found some of Shanita's belongings, including her passport, credit cards, and vaccine record card. They also took Adrian's phone and executed a DNA search warrant by taking a cheek swab.

Meanwhile, the investigation back in Norfolk continued. Police searched the area where Shanita went missing, including using a drone and cadaver dog, but they never found her body. They did, however, find Adrian's truck at the motel. The Department of Forensic Science (DFS) tested swabs from areas of Adrian's truck with suspected blood. The testing showed that the two cloths Witts used to clean Adrian's truck had blood on them. While Shanita could not be eliminated as the source of that blood,[6] Adrian was eliminated as the source of the blood. They also found a spent shell casing inside the windshield wiper well.

As a result of the investigation, Adrian was charged with first-degree murder and use of a firearm in the commission of a felony in the Newport News Circuit Court. A jury convicted Adrian of first-degree murder and acquitted him of the firearms charge. The court sentenced him to life imprisonment. This appeal followed. Background information relevant to his various pre-trial and trial challenges is relayed below.

ANALYSIS

I. There was sufficient evidence to support the trial court's denial of Adrian's motion to strike the first-degree murder charge.

Adrian argues that the trial court erred in denying his motion to strike his first-degree murder charge because the Commonwealth failed to prove that Shanita had been killed and had not simply disappeared. "On review of the sufficiency of the evidence, 'the judgment of the trial

---

[6] Shanita's DNA sample was obtained from a surgical mask since she was not available to provide a sample. DFS compared the mask sample against DNA from Shanita's mother to ensure that the DNA on the mask belonged to Shanita.

court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Shahan v. Commonwealth*, 76 Va. App. 246, 258 (2022) (quoting *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021)). This Court "review[s] the evidence in the light most favorable to the Commonwealth, as the prevailing party below, and determine[s] whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Farmer v. Commonwealth*, 61 Va. App. 402, 416 (2013)). This Court also gives "the Commonwealth the benefit of all inferences fairly deducible from the evidence." *Id.* Thus, "[a]n appellate court does not 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Commonwealth v. Moseley*, 293 Va. 455, 462-63 (2017) (alteration in original) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). Rather, the Court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 463.

"A motion to strike challenges whether the evidence is sufficient to submit the case to the jury." *Wagoner v. Commonwealth*, 63 Va. App. 229, 246 (2014) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 223 (2013)). When the defense moves to strike in a criminal trial, "the trial court should resolve any reasonable doubt as to the sufficiency of the evidence in the [Commonwealth's] favor and should grant the motion only when it is conclusively apparent that [the Commonwealth] has proven no cause of action against defendant" or "when it plainly appears that the trial court would be compelled to set aside any verdict found for the [Commonwealth] as being without evidence to support it." *Avent v. Commonwealth*, 279 Va. 175, 198-99 (2010) (alterations in original) (quoting *Banks v. Mario Indus.*, 274 Va. 438, 454-55 (2007)). Where reasonable minds could differ on a factual issue, the trial court does not err in submitting the issue to the jury. *Ravenwood Towers, Inc. v. Woodyard*, 244 Va. 51, 57-59

(1992). "It . . . is the function of a jury to determine the credibility of witnesses and the weight of the evidence and to resolve all conflicts in the evidence." *Id.* at 57.

"[P]remeditated murder, one of the forms of first degree murder defined by statute, contemplates: (1) a killing; (2) a reasoning process antecedent to the act of killing, resulting in the formation of a specific intent to kill; and (3) the performance of that act with malicious intent." *Rhodes v. Commonwealth*, 238 Va. 480, 486 (1989). Murder may be proven by circumstantial evidence. *See Vasquez v. Dotson*, 303 Va. 97, 106 (2024) ("The definition of murder (and, it follows, all types of murder) requires the 'fact of a death'" and "[t]hat fact 'may be established directly or circumstantially, but it must be established.'" (quoting John L. Costello, *Virginia Criminal Law and Procedure* § 3.2[3], at 42 (4th ed. 2008))); *Schlimme v. Commonwealth*, 16 Va. App. 15, 18 (1993) (Any criminal charge, including first-degree murder, "[may] be proved by circumstantial evidence . . . 'where all the circumstances of time, place, motive, means, opportunity and conduct concur in pointing out the accused as the perpetrator of the crime.'" (alterations in original) (quoting *Potts v. Commonwealth*, 12 Va. App. 1093, 1097 (1991))).

Our caselaw is clear that the Commonwealth need not produce the victim's body to procure a murder conviction. *See Edwards v. Commonwealth*, 68 Va. App. 284, 297 (2017) ("[N]o law exists in Virginia requiring the Commonwealth to produce a victim's dead body to obtain a conviction for murder."). In a murder case where the victim's body has not been discovered, the evidence proving conviction will usually be circumstantial. The circumstantial evidence of the *corpus delicti*[7] "must consist of proof (1) of the victim's death, and (2) that it

---

[7] *Corpus delicti* means "'the body of a crime' and refers to 'the fact that the crime charged has been actually perpetrated.'" *Rams v. Commonwealth*, 70 Va. App. 12, 28-29 (2019) (quoting *Aldridge v. Commonwealth*, 44 Va. App. 618, 648 (2004)).

resulted from the criminal act or agency of another." *Epperly v. Commonwealth*, 224 Va. 214, 229 (1982).

*Epperly* was the first murder case to come before our Supreme Court in which the victim's body was never recovered. There, the Court affirmed that there was sufficient evidence of murder because the circumstances showed beyond a reasonable doubt that the victim was dead due to the defendant's criminal act. *Id.* at 229-30. The jury "was entitled to take into account" the evidence of a violent struggle where the victim was last seen, "her hidden, blood-soaked clothing, and the defendant's incriminating statements—particularly his reference to 'the body' before it was generally thought she was dead." *Id.* at 230. The Court also noted that "[t]he unlikelihood of such a voluntary disappearance," especially in an age of "[w]orldwide communication and travel" and in light of the absent person's "health, habits, disposition, and personal relationships," constituted "circumstantial evidence entitled to weight equal to that of bloodstains and concealment of evidence." *Id.* at 228-29. The Court found that a jury could view the victim's sudden disappearance in conjunction with her responsible character and unlikelihood to leave her life behind as evidence of her death. *Id.* at 230.

More recently, in *Edwards*, this Court affirmed a defendant's second-degree murder conviction where the victim's body was not found. 68 Va. App. at 297-301. The Court emphasized the evidence of motive to kill—that the victim and defendant were in a volatile romantic relationship and that the defendant had tried to choke her and threatened her before her murder. *Id.* at 298. The victim had written in her journal after she broke up with the defendant that he had "lost his mind with jealousy" in trying to choke her and that she was afraid of him. *Id.* The Commonwealth also produced evidence that the defendant had learned that the victim was seeing someone new a few days before the murder. *Id.* Other evidence linked him to the crime—his cell phone records showed that his numerous attempts to contact the victim had

suddenly ceased the last day she was ever seen.  *Id.*  Cell-phone evidence and eyewitness testimony placed the defendant at the victim's house on the last night she was seen, and he admitted that he had access to her home.  *Id.* at 299.  The defendant also fabricated an alibi, asking a friend to tell people that they had been together the last day that the victim was seen.  *Id.* And the Commonwealth presented evidence that cleaning supplies were removed from the defendant's car, leading to the inference that he had been cleaning up evidence of the murder. *Id.* at 300.

Finally, *Edwards* emphasized the unlikelihood of voluntary disappearance given that (1) the victim left all of her personal effects at her home (except for her cell phones, which were destroyed along the interstate); (2) there was no activity on her social media accounts or bank accounts after she went missing; and (3) she had plans to attend an event that was to take place after she went missing, making it unlikely that she would live her life in absentia.  *Id.* at 302-03. As in *Epperly*, the unlikelihood of the victim's voluntary disappearance constituted circumstantial evidence supporting guilt.  *Id.* at 303.  The jury was entitled to reject the defendant's hypothesis that the victim voluntarily disappeared as unreasonable.  *Id.* at 303-04.

Here, Adrian argues that while the Commonwealth presented a plethora of evidence to suggest that he was guilty of being a bad spouse, there was insufficient evidence to establish that he murdered Shanita.  He asserts that while there is evidence that he had been controlling towards Shanita and that he acted suspiciously on the day she disappeared, there is no evidence of any prior physical altercations between the couple or that Shanita was afraid that Adrian would hurt her.  He also points out that there was no physical evidence to establish that Shanita was murdered, like a bloody crime scene, and notes that police never found her body despite extensive tracking of Adrian's whereabouts on the day of the disappearance.  Thus, he contends, there is no evidence to suggest that Shanita did not voluntarily walk away from her life.

- 13 -

To the contrary, significant evidence at trial showed it was highly unlikely that Shanita voluntarily disappeared. Many witnesses testified about Shanita's heavy involvement in her church community and her love of her children and other family members and friends. Shanita grew up in the Newport News community, attending the same church since she was a child. It strains belief to conclude that Shanita would simply walk away from her family, particularly her two sons and her sister, to whom she spoke almost daily. This conclusion is even stronger because—before leaving the early service at church on the day she went missing—she told other parishioners she would be back to make an announcement at the second service that day. The announcement was about a large church event planned for later in the week that Shanita had coordinated and that would have been important for her to attend. It is also unbelievable to conclude that Shanita left the area without her bank cards or passport, which were found on Adrian when he was arrested. Finally, Shanita's car remained at her home, so there is no evidence to suggest she left the area that way. In short, the evidence of Shanita's "health, habits, disposition, and personal relationships" presented at trial makes it extremely unlikely that she voluntarily abandoned her life.

There was also extensive circumstantial evidence that Adrian killed Shanita. Shanita was last seen getting into Adrian's truck with him and driving away on the day she disappeared. Adrian's behavior on the day of the disappearance and in the days leading up to it also establishes a clear motive for him to kill his wife. He told numerous witnesses that he believed Shanita was cheating on him and had also suggested that he would kill her if he discovered infidelity. In fact, after Adrian showed up intoxicated and complaining about Shanita to his on-and-off-again girlfriend, Davis, he said Davis had "saved" Shanita for that night but that "if she don't act right, she's done."

Adrian also exhibited controlling behavior, including obtaining records of Shanita's text messages with the phone company, having her text messages sent directly to his phone, and tracking her car with an AirTag. On the day Shanita disappeared, he called her friend and podiatrist, Dr. Myers, to ask whether Shanita was cheating on him. He also called Deidra after Shanita disappeared and told her that Shanita had admitted to cheating on him. He admitted to Davis that he used Shanita's phone—pretending to be Shanita—and sent messages to Deidra. Rather than search for his wife after she allegedly jumped out of his truck, or report her missing, Adrian chose to return home, pack his belongings, pawn her jewelry, and attempt to fly to Jamaica. While waiting for said flight, he told a stranger at the airport "at least five times" that he did not care whether his wife had been hit by a truck. And he told his pastor that he hoped Shanita would "rot in hell." Perhaps most damning are Adrian's numerous Google searches leading up to and on the day of Shanita's disappearance, which included inquiries into the mechanics of killing someone with a firearm, the penalty for murder in Virginia, and whether Jamaica extradites to the United States.

Finally, despite Adrian's argument to the contrary, there was also physical and eyewitness evidence that established that Shanita was killed. Shanita could not be excluded from DNA evidence collected from blood that was found in the passenger's side of Adrian's truck on the day of the disappearance, and a reasonable factfinder could have concluded that the amount of blood was enough that it would not likely have occurred from a mere accident. The fact that Adrian asked Witts to clean the blood on the day of the disappearance also suggests that the blood got onto this truck that day and not sometime in the past. Furthermore, Adrian's explanation for the blood to Witts was that a neighbor had shot his dog in the car, but Adrian's son testified that their family dogs were uninjured. In addition, a spent shell casing was found in the windshield well of the truck. And Deidra saw Adrian putting things into a dumpster on the

afternoon after his wife disappeared. When officers searched the dumpster later that afternoon, they found a dirty shovel, a moving blanket, and several items belonging to Shanita and Adrian, including Shanita's purse and a pair of shoes that she had just purchased the previous weekend and therefore would have been unlikely to throw away.

In sum, the Commonwealth presented enough circumstantial evidence against Adrian that a reasonable factfinder could have believed that he killed Shanita and not that she had walked away from her life, as Adrian contends. "The fact that a murderer may successfully dispose of the body of the victim does not entitle him to acquittal. That is one form of success for which society has no reward." *Epperly*, 224 Va. at 229 (quoting *People v. Manson*, 139 Cal. Rptr. 275, 298 (Cal. Ct. App. 1977)). Accordingly, the trial court did not err in denying Adrian's motion to strike.

> II. The trial court did not err in denying Adrian's motion to suppress because there was probable cause to establish that he had committed a felony when he was detained at the airport.

Adrian contends that the trial court should have granted his motion to suppress the evidence recovered from his person and belongings at Dulles airport because probable cause did not exist to arrest him, and, although the search occurred at an international border, it was not proper under the border search exception to the warrant requirement. The defendant bears the burden of proving that a motion to suppress that was denied below should have been granted. *Glenn v. Commonwealth*, 275 Va. 123, 130 (2008). "When the defendant contends that the evidence sought to be suppressed was obtained in violation of his Fourth Amendment rights, the standard of review on appeal is de novo." *Mason v. Commonwealth*, 291 Va. 362, 367 (2016). In conducting this review, "we consider the evidence in the light most favorable to the Commonwealth and accord the Commonwealth the benefit of all inferences fairly deducible from the evidence." *Id.* "Though the ultimate question whether the officers violated the Fourth

Amendment triggers *de novo* scrutiny, we defer to the trial court's findings of 'historical fact' and give 'due weight to the inferences drawn from those facts by resident judges and local law enforcement officers.'" *Slayton v. Commonwealth*, 41 Va. App. 101, 105 (2003) (quoting *Barkley v. Commonwealth*, 39 Va. App. 682, 689-90 (2003)).

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Generally, an officer must obtain a warrant, supported by probable cause, to search or seize someone's person or property. *Riley v. California*, 573 U.S. 373, 382 (2014). "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Id.*

One such exception to the warrant requirement is found in Code § 19.2-81(B), which provides that an officer may arrest without a warrant "any person whom he has reasonable grounds or probable cause to suspect of having committed a felony not in his presence."[8] A person who is lawfully arrested may be searched under that arrest. *See Ross v. Commonwealth*, 35 Va. App. 103, 105 (2001) ("A search made by a law enforcement officer pursuant to a lawful custodial arrest, which, of course, must be based on probable cause, is a well recognized exception to the warrant requirement.").

"To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Probable cause "exists when the facts and circumstances within the officer's knowledge,

_____

[8] The parties do not dispute that Adrian was arrested at the airport given the nature and duration of the encounter.

and of which he has reasonably trustworthy information, alone are sufficient to warrant a person of reasonable caution to believe that an offense has been or is being committed." *Purdie v. Commonwealth*, 36 Va. App. 178, 185 (2001) (quoting *Jones v. Commonwealth*, 18 Va. App. 229, 231 (1994)). The "very phrase 'probable cause' confirms that the Fourth Amendment does not demand all possible precision." *Joyce v. Commonwealth*, 56 Va. App. 646, 658 (2010) (quoting *Herring v. United States*, 555 U.S. 135, 139 (2009)). "The standard is not calibrated to 'deal with hard certainties, but with probabilities.'" *Id.* (quoting *Slayton*, 41 Va. App. at 106). "Nor does it 'demand any showing that such a belief be correct or more likely true than false.'" *Id.* (quoting *Slayton*, 41 Va. App. at 106).

The trial court found that the evidence was sufficient to establish probable cause that Adrian had committed a felony related to his wife's disappearance when he was stopped at Dulles airport, so the arrest and subsequent search of his personal effects did not violate the Fourth Amendment. We agree that officers had probable cause to arrest Adrian at Dulles airport based on the information they had gathered to that point in the investigation. By the time that Adrian was stopped, Detective Scrimgeour knew[9] that Shanita was at the 8:00 a.m. church service and was expected to be back to give an announcement at the 10:00 a.m. service but never returned. Her sister, children, and friends could not get into contact with her for the rest of the day, which was highly unusual. Adrian had been behaving strangely in the days leading up to his wife's disappearance, including acting angry and controlling towards her. He had made suicidal

---

[9] Because Detective Scrimgeour asked the special agent for Homeland Security Investigations to stop Adrian at Dulles, we look to what information he knew at the time of the arrest in assessing whether there was probable cause under the collective knowledge doctrine. *See Long v. Commonwealth*, 72 Va. App. 700, 717 (2021) ("When the instructing officer possesses sufficient knowledge to take a particular action without violating the Fourth Amendment, and when that knowledge is imputed to the responding officer, the responding officer can take action to the full extent of the constitutional latitude afforded to the instructing officer – without being required to again weigh independently the sufficiency of the instructing officer's basis of knowledge.").

comments that prompted Shanita to remove the firearms from their home. And on the morning of her disappearance, Adrian had called Shanita's sister to ask whether she was cheating on him. He was also texting Shanita's sister from her phone and pretending to be her. Later in the day, after suddenly deciding to take a one-way international flight to Jamaica, Adrian asked Deidra to take care of his sons, which would be an odd request unless he knew his wife would be unable to do so. Adrian's son saw him talking with Shanita and driving off in his truck with her. And Deidra saw Adrian putting things into a dumpster, from which police later recovered a dirty shovel, a moving blanket, and several items belonging to Shanita, including her purse and shoes she had just purchased the week before.

Taking all of this information together, officers had enough evidence to support a reasonable belief that Adrian had killed his wife at the time they arrested and searched him at the airport. Thus, there was probable cause to support the search, and the search complied with Code § 19.2-81(B). As such, the officers did not violate the Fourth Amendment or Virginia law.[10]

_____

[10] Because we find that there was probable cause, we do not address whether the "border exception" to the warrant requirement would also have supported the search of Adrian and his personal effects. This exception applies "[a]t a border" or its "'functional equivalent,' like [an] international airport" and allows "government agents [to] conduct 'routine' searches and seizures of persons and property without a warrant or any individualized suspicion." *United States v. Kolsuz*, 890 F.3d 133, 137 (4th Cir. 2018). There is a federal circuit split over whether the border exception allows searches in furtherance of a generalized law enforcement purpose that does not relate to the reasons for the exception's creation. *Compare United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019) (holding that officers violated the Fourth Amendment by conducting a search of a cell phone seized at the border where the reasonable suspicion was based on a report that the defendant had sexually trafficked a minor); *United States v. Cano*, 934 F.3d 1002, 1020 (9th Cir. 2019) (finding that the border exception does not apply to searches for evidence of non-border-related crimes nor for "evidence of past or future border-related crimes"), *with United States v. Mendez*, 103 F.4th 1303, 1309 (7th Cir. 2024) (concluding that the governmental interest in detecting child pornography at the border is sufficient to fall under the exception); *Alasaad v. Mayorkas*, 988 F.3d 8, 21 (1st Cir. 2021) (observing that the narrow view of the exception "fails to appreciate the full range of justifications for the border search exception beyond the prevention of contraband itself entering the country"); *United States v. Touset*, 890 F.3d 1227, 1235 (11th

III. The trial court did not err in attributing the pre-trial continuance to the defense and in finding that Adrian's speedy trial rights were not violated.

Adrian next argues that the trial court erred in failing to dismiss his charges based on a violation of his right to a speedy trial. "On appeal, a statutory speedy trial challenge presents a mixed question of law and fact. The Court reviews legal questions de novo, while giving deference to the trial court's factual findings." *Young v. Commonwealth*, 297 Va. 443, 450 (2019) (quoting *Harris v. Commonwealth*, 266 Va. 28, 32 (2003)).

Code § 19.2-243 provides that "the accused, if he is held continuously in custody thereafter, shall be forever discharged from prosecution for such offense if no trial is commenced in the circuit court within five months from the date such probable cause was found by the district court." This Court has recognized that the five-month requirement equates to "152 and a fraction days." *Ballance v. Commonwealth*, 21 Va. App. 1, 6 (1995). This time period is "not absolute" and can be tolled in several enumerated circumstances. *Young*, 297 Va. at 451. Under Code § 19.2-243(4), the statutory deadline is tolled for the "period of time as the failure to try the accused was caused . . . [b]y continuance granted on the motion of the accused or his counsel." A delay is attributable to the defendant if it was requested by the defendant, *Price v. Commonwealth*, 24 Va. App. 785, 790-91 (1997), the defendant "concurred" in the delay, *Arnold v. Commonwealth*, 18 Va. App. 218, 223 (1994), or the purpose of the delay was to allow the defendant to prepare, *Heath v. Commonwealth*, 32 Va. App. 176, 182 (2000).

"[W]hen a defendant challenges [a] delay as unreasonable, the burden devolves upon the Commonwealth to show, first, what delay was attributable to the defendant and not to be counted against the Commonwealth and, second, what part of any delay attributable to the prosecution

---

Cir. 2018) (applying border exception to a search for child pornography on a phone); *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006) (concluding that the validity of a border search does not depend on the motive for the search).

was justifiable." *Holliday v. Commonwealth*, 3 Va. App. 612, 617 (1987) (first alteration in original) (citation omitted). Whether a delay is justified where there has been a continuance depends in part on whether the Commonwealth acted in bad faith. *Taylor v. Commonwealth*, 4 Va. App. 45, 51 (1987). The bad faith analysis "turns almost entirely upon the subjective motivation or state of mind." *Logan v. Commonwealth*, 279 Va. 288, 293 (2010). To show bad faith, "the evidence must show" that the action "was motivated by bias, personal animus, a desire to harass, a conscious intent to circumvent the law, or a similar improper motive." *Id.*

The issue here is whether the court properly assigned a certain delay to Adrian, or whether that delay should have been attributed to the Commonwealth. On the Monday morning the trial was set to begin, defense counsel moved for a continuance because the Commonwealth had provided the defense with discovery that defense counsel contended was "plainly exculpatory in nature" on the Friday before the trial date, despite having first learned of the evidence more than two weeks earlier. The evidence in question was that Shanita had told a friend that she hated her life and that she wanted to go to Canada and "get away." The defense argued that they were "being forced by the Commonwealth" to ask for a continuance because they needed more time to review this potentially exculpatory evidence. The Commonwealth opposed the motion. The court granted the motion and attributed the continuance to the defense because the court did not believe "there [were] any shenanigans going on with respect to" the discovery disclosure and that the Commonwealth was "diligent" and reasonable in investigating the witness's statements before turning them over to the defense.

Adrian argues the court erred in its conclusion because defense counsel and the Commonwealth interacted five times between the Commonwealth's discovery of the potentially exculpatory information and its disclosure to the defense. The Commonwealth contended that they were not dilatory because they had the right to conduct an initial investigation into the

potentially exculpatory information (talking to all the witnesses) before turning it over to the defense and also emphasized that this additional investigation did not yield any additional exculpatory information.[11]

This Court considered a situation like this one in *Taylor*, 4 Va. App. at 51. There, the Commonwealth informed the defendant the day before trial that it had received potentially exculpatory information—that someone else may have committed the crime—although the police had also learned that the other suspect had an alibi that appeared to be corroborated. *Id.* at 48. The defense requested a continuance to investigate the other suspect further. *Id.* While the trial court "concluded that the Commonwealth had done nothing wrong in failing to reveal the information earlier and that the information probably was not exculpatory," it nonetheless granted the continuance "to avoid any question." *Id.* On appeal, this Court found that the continuance was properly attributed to the defense. *Id.* at 51. The Court reasoned that the continuance could not be imputed to the prosecution "[a]bsent a showing of bad faith on the part of the Commonwealth" and that there was no evidence to suggest any bad faith. *Id.*

Here, the trial court concluded that the Commonwealth did not intentionally delay turning the evidence over to hinder the defense, and therefore, the continuance should be counted against the defense. The court made explicit factual findings that "there [were not] any shenanigans going on with respect to" the discovery disclosure and that the Commonwealth was "diligent"

_____

[11] In response to Adrian's motion to dismiss the indictments following the passage of the statutory speedy trial deadline, the Commonwealth filed a sealed response recounting the conversations and emails exchanged with defense counsel during the two weeks between the discovery of the evidence and turning it over. Those communications revealed that the parties were engaged in plea negotiations under which Adrian would identify where Shanita's body was located. The Commonwealth argues that in light of those conversations, the witness's statement was not exculpatory. We must unseal these portions of the record and appellee's brief to resolve the issues raised on appeal. "To the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Brandon v. Coffey*, 77 Va. App. 628, 632 n.2 (2023) (quoting *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017)).

and reasonable in investigating the witness's statements before turning them over to the defense. There is no evidence in the record to suggest that these findings were plainly wrong or without evidence to support them, so we affirm the trial court's ruling that Adrian's speedy trial rights were not violated.

IV. The admission of each of Shanita's hearsay statements was either permitted under an exception to the hearsay rule or constituted harmless error.

The trial court allowed the Commonwealth to introduce Shanita's hearsay statements at trial over Adrian's objection. Adrian argues that several of these statements should not have been admitted because they do not fit under an exception to the hearsay rule.

"Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." *Donahue v. Commonwealth*, 225 Va. 145, 151-52 (1983) (quoting *Stevenson v. Commonwealth*, 218 Va. 462, 465 (1977)). It "is inadmissible unless it falls within one of the recognized exceptions to the hearsay rule, and . . . the party attempting to introduce a hearsay statement has the burden of showing the statement falls within one of the exceptions." *Campos v. Commonwealth*, 67 Va. App. 690, 705 (2017) (alteration in original) (quoting *Godoy v. Commonwealth*, 62 Va. App. 113, 119 (2013)).

This Court will not reverse a conviction simply because one or more hearsay statements were improperly admitted. "Any error that does not implicate the trial court's subject matter jurisdiction is subject to harmless-error analysis because 'Code § 8.01-678 makes "harmless-error review required in *all* cases."'" *Spruill v. Garcia*, 298 Va. 120, 127 (2019) (quoting *Commonwealth v. White*, 293 Va. 411, 420 (2017)). A non-constitutional error is harmless if, "when all is said and done, . . . the error did not influence the jury, or had but slight effect." *Ramsey v. Commonwealth*, 63 Va. App. 341, 356 (2014) (quoting *Clay v. Commonwealth*, 262

Va. 253, 260 (2001)). But if we "cannot say, with fair assurance, after pondering all that happened . . . that the judgment was not substantially swayed by the error, . . . the conviction cannot stand." *Id.* (quoting *Clay*, 262 Va. at 260). "Relevant to this analysis is whether 'the evidence admitted in error was merely cumulative of other, undisputed evidence.'" *Holloman v. Commonwealth*, 65 Va. App. 147, 172 (2015) (quoting *Ferguson v. Commonwealth*, 16 Va. App. 9, 12 (1993)). "In considering harmless error, we examine the full context of the case under these well-established principles." *Id.*

The state-of-mind exception to the hearsay rule permits a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)." Va. R. Evid. 2:803(3). "Generally, statements made by a crime victim that show the victim's state of mind are admissible as an exception to the hearsay rule, provided the statements are relevant and probative of some material issue in the case." *Khine v. Commonwealth*, 75 Va. App. 435, 445 (2022) (quoting *Clay*, 262 Va. at 257). "[F]or the state of mind of the victim to be relevant to prove the state of mind of the accused, some nexus must exist which inferentially implicates the accused . . . ." *Id.* (first alteration in original) (quoting *Clay v. Commonwealth*, 33 Va. App. 96, 105 (2000)).[12]

We find that at least some of Shanita's hearsay statements were properly admitted under Virginia Rule of Evidence 2:803(3). For example, Adrian objected to testimony from Tiffany that

---

[12] At trial, the Commonwealth argued that all of the challenged statements were admissible under *Epperly v. Commonwealth*, 224 Va. 214 (1982), because that case stands for the proposition that a no-body case can be proved by circumstantial evidence and that therefore statements made by the decedent leading up to their death are "relevant, material, and therefore admissible." But *Epperly* did not address hearsay because the statements in that case were offered as "evidence of the good character and peaceable nature of the deceased," which is ordinarily not admissible in court because it is irrelevant. 224 Va. at 230. A no-body case presents an exception to the general rule because the normally excluded evidence *actually does become relevant* under those specific circumstances. *Id.* The reasoning of *Epperly* does not, however, extend to allow for the admission of every hearsay statement made by a decedent leading up to their death.

Shanita had told her that she would be right back as she was leaving the church on the morning of her disappearance. This statement expressed Shanita's then-existing mental condition or otherwise was a statement of her intent under Rule 2:803(3). If a "victim's statements regarding fear of the accused are admissible to rebut claims by the defense of self-defense . . . or accidental death," *Clay*, 262 Va. at 257, a statement that shows that a victim intended to return to church and continue communicating with friends and family rebuts the suggestion that she voluntarily disappeared. And while Adrian objected below to the admission of testimony from various witnesses who reported that Shanita had told them that she wanted to divorce Adrian, he now concedes on appeal that these statements were admissible under Rule 2:803(3).

There were other statements admitted at trial that do not fit into a hearsay exception, but we conclude that the admission of those statements was harmless. For example, Mitchell testified that Shanita had told him that there was an AirTag in her car, but evidence was admitted that Adrian had also independently told Mitchell about the AirTag. Similarly, multiple witnesses testified that Shanita had told them that Adrian had been talking about committing suicide, but the admission of this testimony was harmless because Deidra testified that Adrian had told her directly that he had been considering killing himself. Thus, this evidence, even if admitted in error, "was merely cumulative of other, undisputed evidence." *Holloman*, 65 Va. App. at 172 (quoting *Ferguson*, 16 Va. App. at 12). Finally, testimony that Shanita told Pastor Riddick that she was unhappy, or not sure why she was meeting with him for marriage counseling, did not amount to any evidence against Adrian in the first place. In total, all the statements were benign in nature compared to the degree and character of the other evidence against Adrian.

Thus, because the admission of Shanita's hearsay statements to which Adrian assigned error was either proper or constituted harmless error, we do not reverse the conviction on that basis.

V. The trial court did not abuse its discretion in allowing Detective Parker to testify as an expert on cell phone data evidence.

Adrian next argues that the trial court erred in admitting the Commonwealth's lead digital forensics witness, Detective Andrew Parker, as an expert in call detail records, geolocation records, and cell phone download analysis. He especially argues that the court erred in allowing him to testify about ZetX software because, while he had training and experience in using these technologies, he was not a computer scientist, and he admitted that he did not know how the software algorithm worked.

"The admission of expert testimony is a matter within the sound discretion of the trial court, and we will reverse the trial court's judgment only when the court has abused this discretion." *Toraish v. Lee*, 293 Va. 262, 268 (2017) (quoting *Keesee v. Donigan*, 259 Va. 157, 161 (2000)).[13] This deferential standard means that a "trial judge's ruling will not be reversed simply because an appellate court disagrees." *McDaniel v. Commonwealth*, 73 Va. App. 299, 308 (2021) (quoting *Campos*, 67 Va. App. at 702).

"Expert testimony is generally admissible if it will aid the trier of fact in understanding the evidence." *Toraish*, 293 Va. at 268. The Rule governing the admission of expert testimony, Virginia Rule of Evidence 2:702, provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." In a criminal proceeding, a trial court must also find "that the subject matter is beyond the knowledge and experience of ordinary persons, such

---

[13] The three principal ways a court abuses its discretion are "when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment." *Manchester Oaks Homeowners Ass'n v. Batt*, 284 Va. 409, 426 (2012) (quoting *Landrum v. Chippenham & Johnston-Willis Hosps., Inc.*, 282 Va. 346, 352 (2011)).

that the jury needs expert opinion in order to comprehend the subject matter, form an intelligent opinion, and draw its conclusions." Va. R. Evid. 2:702(a)(ii). "[T]he admission of expert testimony is [also] subject to certain fundamental requirements, including the requirement that the evidence be based on an adequate foundation." *Keesee*, 259 Va. at 161.

Neither this Court nor our Supreme Court has outlined any specific qualifications that a witness must have to testify as an expert and have largely left the assessment of expert qualifications to a trial court's discretion. "An expert witness may acquire the requisite knowledge of a subject matter through experience and observation in a variety of ways, including participation in a vocation, without formal training or education." *McDaniel*, 73 Va. App. at 309 (quoting *Kilby v. Commonwealth*, 52 Va. App. 397, 410 (2008)). "This Court will not reverse a trial court's decision to admit testimony of an expert 'unless it plainly appears that the witness was not qualified.'" *Id.* (quoting *Kilby*, 52 Va. App. at 410).

In *McDaniel*, 73 Va. App. at 299, this Court affirmed the qualification of an expert on blood spatter analysis. The special agent who testified in that case was a member of the Virginia State Police who had attended the Virginia Forensic Science Academy, where she had received some "general training in analyzing blood spatter." *Id.* at 309. She then received 40 more hours of training in blood spatter analysis after graduation and then attended an additional three blood spatter courses. The special agent had consulted on blood spatter evidence more than 200 times and testified in court as a blood spatter expert on three prior occasions. *Id.* McDaniel argued that the special agent was not qualified to testify because she lacked "an understanding of the physics of fluid transfer" and "pathology of wounds," knowledge that was recommended by a National Research Council report. *Id.* at 310. This Court affirmed the trial court's finding that the agent's training and experience was sufficient to qualify her as an expert because she "possessed 'a degree of knowledge of [the] subject matter' of blood spatter evidence 'beyond

that of persons of common intelligence and ordinary experience'" that she had gained "through specialized training and vocational experience." *Id.* The Court acknowledged McDaniel's argument that the agent lacked the requisite knowledge to testify on blood spatter but noted that the agent asserted she did have such knowledge and emphasized that "Virginia law allows an expert to gain expertise solely through vocational training." *Id.* at 312. Thus, McDaniel's contention that the expert lacked certain knowledge was just a "factor for the trial court's consideration in determining whether [the agent] was qualified as an expert under the Virginia Rules of Evidence." *Id.* at 311.

Detective Parker testified that he is a member of the Technical Investigations Unit in the Major Crimes Division of the Norfolk Police Department. He had about "450 hours of formal training and countless hours of informal training from other experts in the field" at the time of trial. He testified that some of this training was provided by LexisNexis, the owner of ZetX Solutions, and some was provided by the Federal Bureau of Investigation. He had "hundreds of hours" of training on "call detail records"—the practice of obtaining a record of a person's cell phone calls from their service provider. He also had "several hundred hours" of training in "geolocation records," which provide information about what cell site or tower a phone connected with and can therefore be used to track the location of a phone. Detective Parker also had experience with "cellular download analysis"—extracting the contents from cellular devices and putting them into a format that is easier for investigators to read. He testified that he had been admitted as an expert in all three of these subjects in four of the Newport News Circuit Courts, in one of the Newport News Criminal Courts, and in one of the Newport News Juvenile and Domestic Relations District Courts.

Following Adrian's objection to Detective Parker's admission as an expert, the trial court explained that it had found that "the testimony of Detective Parker with respect to his education,

the classes he's taken and the experience would more than satisfy the fact he has expertise that is beyond that of a reasonable or ordinary person, that his skills, expertise and training and education is more than the average person in this area." The court also found that "the subject-matter is beyond the knowledge and experience of an ordinary person." Accordingly, the court determined that Detective Parker was qualified to testify as an expert witness under Rule 2:702.

We cannot say that the court erred in making this determination. Detective Parker testified that he gained significant experience over the course of years in conducting cell phone data analysis, including using ZetX. Indeed, that seemed to comprise much of his job responsibilities. He had also received several formal trainings on cell phone analysis and ZetX technology, as well as many hours of informal training, and he had taught two classes on cell phone analysis. While he did not have experience in computer science and could not explain the exact algorithm that ZetX uses to process and analyze data, he used the program as it was intended and had no reason to believe that it was not operating properly.[14] He also noted during his testimony that he had manually verified the analysis that ZetX produced, which bolstered the reliability of his results.

Virginia law simply does not require an expert on geolocation or other cell phone data to have a sophisticated understanding of the algorithm of the software used to conduct the data analysis. "If we required expert witnesses to have detailed knowledge of the software underlying their testimony, they could almost never testify on matters related to proprietary technology."

_____

[14] The analysis of cell phone data, and geolocation data in particular, is well-accepted in modern courts. *See United States v. Reynolds*, 86 F.4th 332, 347 (6th Cir. 2023) ("Courts and scientists alike have 'widely accepted' the common practice of determining a cellphone's 'general location'—with critical emphasis on *general*—by identifying the specific antenna that the phone connected to at a specific time." (collecting cases)). And many courts have approved the ZetX technology that Detective Parker employed in this case. *See Wells v. State*, 675 S.W.3d 814, 829 (Tex. App. 2023) ("[T]his Court and many others have already concluded that maps based solely on cell-site location data, including specifically ZetX mapping, are sufficiently reliable to be admissible at trial." (collecting cases)).

*United States v. Morgan*, 45 F.4th 192, 203 (D.C. Cir. 2022). An expert unable to "explain the 'inner workings of the software,'" may nevertheless be able to "assure [its] reliability . . . through other means." *Id.*

This Court cannot find that it "plainly appears that [Detective Parker] was not qualified" under Rule 2:702 and therefore affirms the trial court's decision to qualify Detective Parker as an expert witness.

> VI. The trial court did not abuse its discretion in declining to instruct the jury on voluntary manslaughter.

Adrian finally argues that the trial court erred in refusing his proposed jury instruction on voluntary manslaughter. He contends that because there was no direct evidence of what occurred on July 17 that could have caused him to kill Shanita, the jury could have reasonably believed that the alleged killing occurred in the heat of passion. Specifically, he posits that Shanita may have admitted to cheating on Adrian, as Adrian reported to Deidra, and that may have prompted the alleged murder. The Commonwealth counters that even if the jury could have believed that theory, the provocation would still amount to mere words, which Virginia courts have consistently held do not constitute sufficient provocation to support a heat of passion defense. The Commonwealth further contends that the evidence supported a finding of extended premeditation rather than a killing in the heat of passion.

This Court "review[s] jury instructions to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises. This is a mixed question of law and fact" that we review de novo. *Watson v. Commonwealth*, 298 Va. 197, 207 (2019) (alteration in original) (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)). "[J]ury instructions are proper only if supported by the evidence, and more than a scintilla of evidence is required. When reviewing a trial court's refusal to give a proffered jury instruction, we view the

evidence in the light most favorable to the proponent of the instruction." *Id.* (quoting *Payne*, 292 Va. at 869).

"A killing done in the heat of passion and upon reasonable provocation will reduce a homicide from murder to voluntary manslaughter." *Rhodes v. Commonwealth*, 41 Va. App. 195, 200 (2003). "Heat of passion refers to the *furor brevis* which renders a man deaf to the voice of reason." *Williams v. Commonwealth*, 64 Va. App. 240, 249 (2015) (quoting *Graham v. Commonwealth*, 31 Va. App. 662, 671 (2000)). "Malice and heat of passion are mutually exclusive; malice excludes passion, and passion presupposes the absence of malice." *Barrett v. Commonwealth*, 231 Va. 102, 106 (1986). Heat of passion "excludes malice when provocation reasonably produces fear [or anger] that causes one to act on impulse without conscious reflection." *Rhodes*, 41 Va. App. at 200 (alteration in original) (quoting *Graham*, 31 Va. App. at 671).

It is well-settled, though, that "[w]ords alone, no matter how offensive or insulting they may be, are never sufficient provocation to reduce the offense of murder to manslaughter." *Id.* at 199. Thus, a trial court need not instruct a jury on heat of passion where the evidence shows only that the defendant and victim exchanged "harsh words" before an assault or murder. *Caudill v. Commonwealth*, 27 Va. App. 81, 84-85 (1998).

Any admission that Shanita was cheating on Adrian would amount to mere words and therefore would not warrant a voluntary manslaughter instruction. For a trial court to be required to give a jury instruction, there must be "more than a scintilla" of evidence to support it. Here, there was no evidence presented at trial that Shanita and Adrian exchanged anything more than mere words in the moments before her death. Deidra testified that Adrian had told her that Shanita had admitted to cheating on him. Certainly, if that is true, such an admission would have caused Adrian to become passionate given his apparent suspicions regarding his wife's potential

infidelity and the lengths he had taken to uncover the alleged affair.  But even an admission of that magnitude would have consisted of words alone.

Absent any evidence of a physical exchange between Adrian and Shanita, and given the affirmative evidence showing premeditation, this Court cannot find that the trial court erred in refusing the jury instruction.

CONCLUSION

Finding no error in the judgment below, we affirm Adrian's conviction for first-degree murder.

*Affirmed*.